**Kevin Reid ALTHOUSE**

v.

**Dr. Robert ROE, et al.**

**Civil Action No. 6:07cv22.**

United States District Court,
E.D. Texas,
Tyler Division.

April 8, 2008.

Kevin Reid Althouse, Tennessee Colony, TX, pro se.

## MEMORANDUM ADOPTING REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE AND ENTERING FINAL JUDGMENT

LEONARD DAVIS, District Judge.

The Plaintiff Kevin Althouse, proceeding *pro se*, filed this lawsuit complaining of alleged violations of his constitutional rights. This Court ordered that the matter be referred to the United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to United States Magistrate Judges.

Althouse complained generally about the medical care which he received, largely revolving around his claim that he suffers from Attention Deficit Hyperactivity Disorder (ADHD). The Magistrate Judge conducted a lengthy evidentiary hearing and received and reviewed copies of Althouse's medical and grievance records, which are extensive.

After review of the pleadings, testimony, and records in the case, the Magistrate Judge issued a Report on January 30, 2008, recommending that the lawsuit be dismissed. The Magistrate Judge first concluded that Althouse has filed at least three lawsuits or appeals which have been dismissed as frivolous or for failure to state a claim upon which relief may be granted, and so he is subject to the three-strikes bar of 28 U.S.C. § 1915(g). In this connection, the Magistrate Judge stated that Althouse did not pay the filing fee and did not show that he is in imminent danger of serious physical injury, rejecting Althouse's claims to the contrary.

The Magistrate Judge then went on to review the merits of Althouse's claims. In so doing, the Magistrate Judge first observed that Althouse's medical records show that he is receiving a significant amount of care, and that Althouse's disagreement with the quality of this care does not rise to a constitutional level. The Magistrate Judge specifically noted that Althouse's prison records do not contain a diagnosis of ADHD, and that the standard treatment for ADHD, consisting of amphetamine-based medications, is not available within TDCJ. Instead, Althouse was given a medication called Tegretol, one of the purposes of which is to treat persons with impaired judgment, which is the harm which Althouse cites as a result of ADHD. The Magistrate Judge stated that "the fact that Althouse did not receive the medication which he would have preferred, or that the medication which he received was not as effective as he would have liked, is not proof of deliberate indifference to a serious medical need."

The Magistrate Judge also recommended dismissal of Althouse's claims under the Americans with Disabilities Act. Althouse specifically alleged that he was denied access to recreation because of the lack of closed captioning on the televisions in the dayroom, but the Magistrate Judge determined that this claim failed to show a violation of the ADA.

Althouse complained that a letter which his father sent, showing that he suffered from ADHD, had been lost, and that he did not receive appropriate responses to his grievance, but the Magistrate Judge determined that this contentions did not set out constitutional violations. He also complained about his work restrictions and again asserts that the medical care which he received has been deficient, but the Magistrate Judge concluded that Althouse failed to show that he had been the victim of deliberate indifference. The Magistrate Judge therefore recommended that Althouse's lawsuit be dismissed.

Althouse filed objections to this Report on March 20, 2008, and supplemental objections on March 24. In his first set of objections, Althouse begins by complaining that the Magistrate Judge said that he has no diagnosis of ADHD, whereas in fact he does have such a diagnosis. He points to a number of exhibits which he submitted with his supplemental complaint, but only two of these exhibits, an affidavit from his father and a letter from a retired elementary school principal, make reference to a diagnosis for ADHD. Other diagnoses given to Althouse, as reflected in these exhibits, include: personality trait disturbance, passive-aggressive personality, anti-social personality, schizophrenia, and bi-polar disorder. The affidavit from his father indicates that Althouse was diagnosed with ADHD at the Family Guidance Center in Reading, Pennsylvania, through the use of Ritalin, apparently in childhood. However, the Ritalin had to be discontinued because of the side effects, including listlessness and substantial weight gain. A psychiatric note from the Reading Hospital and Medical Center, from Althouse's early adulthood, says that Althouse's psychomotor activity is normal, there is no evidence of any thought disorder, that he is not psychotic, and that he has a character disorder in that he has no capacity to delay gratification. None of the medical records in Althouse's exhibits make any reference to a diagnosis of ADHD.

In any event, the Magistrate Judge did not say that Althouse had never been diagnosed as suffering from ADHD, as Althouse asserts, but rather that TDCJ's records did not reflect a diagnosis of ADHD. Althouse says that on February 26, 2003, a TDCJ physician named Dr. Limsiaco diagnosed him with ADHD, but the medical record he attaches as an exhibit does not

support this conclusion; this record (pp. 62 and 63 of the exhibits attached to the supplemental complaint) shows that Althouse told Dr. Limsiaco that he had a history of ADHD, but the actual diagnosis made by the doctor was "depressive disorder."

Althouse also refers to an order from the federal district court in Dallas County, appointing him counsel in a civil case, in part because of Althouse's representation of his mental condition to that court. The fact that the court in Dallas determined that Althouse's representations concerning his mental status warranted appointment of counsel in another civil case does not show that TDCJ personnel acted with deliberate indifference to him, nor that he is in imminent danger of serious physical injury.

In effect, Althouse asserts that the fact that he suffers from ADHD, *by itself,* is sufficient to show that he is in imminent danger of serious physical injury. He says that because of his ADHD condition, he is in constant danger because he might at any time act on impulse and thereby place himself in peril. By contrast, in *Ciarpaglini v. Saini,* 352 F.3d 328, 330 (7th Cir. 2003), the only circuit court decision to hold that allegations of discontinuation of medication for ADHD and panic disorder could satisfy the imminent danger prong, the plaintiff alleged that his panic attacks caused him to suffer heart palpitations, chest pains, labored breathing, choking sensations, and paralysis in his legs and back. These allegations are specific assertions of concrete harm, unlike Althouse's generalized speculation that he might act on impulse and thereby place himself in danger. No court has held that the simple fact of ADHD by itself is sufficient to satisfy the imminent danger prong, as Althouse contends. *See also Desroche v. Strain,* 507 F.Supp.2d 571, 583 (E.D.La. 2007).

In a similar vein, Althouse complains that the Magistrate Judge observed that he was being treated with Tegretol for impulsivity, but points out that Tegretol is not a treatment for ADHD and that it was not effective. Whether or not Tegretol is a treatment for ADHD, it is a recognized treatment for impulsivity, as the Magistrate Judge observed, which is the symptom which Althouse complains is placing him in danger. The fact that the medication was not as effective as Althouse may have wished does not show that the prison officials were deliberately indifferent to his medical needs.

Next, Althouse complains that Ronnie Hill, a named defendant in the lawsuit, was present at the *Spears* hearing, over his objections. He says that the Magistrate Judge "allowed him [Hill] to make an observation on the merits of Plaintiff's assertion that he suffers ADHD and in her report she is again relying upon his judgment regarding the merits."

At the hearing, Hill testified that it is difficult to diagnose adult ADHD and that the treatment for ADHD involves amphetamine-based medications which are not available in prison. He noted that the prison medical records contain no diagnosis for ADHD and that Althouse's demeanor at the hearing was not consistent with ADHD, in that Althouse was able to recall dates of past events without difficulty and to remain calm and focused during the hearing.

Althouse has not shown that any of this testimony was objectionable or should have been excluded. The fact that Althouse's prison medical records contain no diagnosis for ADHD was confirmed by the Court's own perusal of these records, and Althouse's demeanor at the hearing was clearly visible and apparent. Hill did not comment directly on the merits of Alt-

house's claims. Althouse's objection on this point is without merit.

Althouse points to a grievance which he filed in which he was told that the current treatment for ADHD is with medications not available within TDCJ. He says that this shows that the prison officials are "intentionally refusing to treat his condition." The fact that prison officials do not make amphetamine-based medications available to prisoners is not proof of deliberate indifference, particularly in light of the fact that Althouse's impulsivity was treated with Tegretol. Althouse's complaints regarding the relative efficacy of Tegretol do not show that a constitutional violation occurred. His claim on this point is without merit.[1]

Althouse next turns to the Americans with Disabilities Act, arguing that he is "disabled" within the meaning of the term. To the extent that Althouse seeks to bring his claims for inadequate medical care under the ADA, this request is misplaced. The courts have held that a lawsuit under the Rehabilitation Act or the Americans with Disabilities Act cannot be based on medical treatment decisions. *See Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1294 (11th Cir.2005); *Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134, 1144 (10th Cir.2005); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir.1996) (ADA does not create a remedy for medical malpractice).

Althouse also complains that he has a right to participate in the "recreational activity" of watching television, but that he is easily distracted, so when he is in a crowded dayroom with two television sets, each tuned to a different station, his impairment prevents him from being able to understand the program he is watching without closed captioning. As the Magis-

trate Judge stated, no case in any jurisdiction, state or federal, has found the provision of closed-captioned television for persons suffering from ADHD to be mandated under the Americans with Disabilities Act; furthermore, Althouse has not shown that he has been discriminated against because of his disability. This contention is without merit. Althouse also says that the medical condition of his jaw is fragile and that he was assaulted by other inmates when he complained about the lack of closed-captioning. This does not make the failure to turn on closed-captioning an actionable claim under Section 1983 or the Americans with Disabilities Act.

In the next section of his objections, Althouse says that the State of Texas has created a liberty interest to the effect that a prisoner completes required programs, maintains a clear conduct record, and addresses the problems which brought him to prison, parole "should follow as a matter of course." He cites Tex. Gov.Code art. 508.144, but this statute requires the Parole Board to develop guidelines that are the basic criteria on which a parole decision is made, base these guidelines on the seriousness of the offense and the likelihood of a favorable parole outcome, and ensure that the guidelines require consideration of an inmate's progress in any programs in which the inmate participated during his term of confinement. Nothing in the statute creates a liberty interest which accrues to inmates or ensures that parole shall "follow as a matter of course." To the extent that Althouse contends that this statute creates a liberty interest which must be enforced through an order giving him the treatment he believes appropriate, his claim is without merit.

---

**1.** In addition, the affidavit from Althouse's father says that Ritalin treatment, which Althouse says would be more appropriate, had to

be discontinued because of the side effects, including listlessness and substantial weight gain,

Althouse asserts that the failure to perform surgery on his broken collarbone amounts to deliberate indifference to his serious medical needs. He was scheduled for surgery at one time, but this had to be postponed because of his collapsed lung. As the Magistrate Judge observed, surgery is often not done at all on broken collarbones because they heal without it. Although Althouse says that his need for surgery is a serious medical need, the medical records show that he has advised the nursing staff on at least one occasion, after suffering the broken collarbone, that he was able to do sit-ups, push-ups, and lift weights. Althouse has not shown a constitutional violation in the treatment of his broken collarbone.

Althouse further argues that Nurse Bobby Burns should be liable because in January of 2004, he told Burns that he was having chest pains, and Burns said that it was a strained diaphragm muscle and that if he stopped exercising for a few days, the pain would go away. Althouse followed this advice and the pain did go away. Almost two years later, he says, he again experienced chest pains, and did not seek medical care because of Burns' advice, but this time the chest pain turned out to be a collapsed lung. Althouse's notion that the apparently accurate advice given in January of 2004 renders Burns liable for an incident which occurred in December of 2005 is plainly without merit. He asserts that Burns "misdiagnosed his collapsed lung" but offers nothing to show that it was in fact a collapsed lung which he had in January of 2004. Finally, Althouse takes issue with the Magistrate Judge's statement that he is receiving medical care for his condition, but simply disagrees with this care; a review of Althouse's extensive medical records shows that he has in fact received a considerable quantum of medical care. His objection on this point is without merit.

Althouse also filed a set of supplemental objections, consisting of additional exhibits. The first of these is a letter from his father, Lawrence Althouse, dated January 14, 2008, addressed to the District Attorney's Conviction Integrity Unit in Dallas. This letter asserts that Althouse was diagnosed at age five with ADHD, and that as a result, Althouse has very little impulse control, acting impulsively rather than after due thought; in other words, thoughts are immediately translated into actions, instead of first going through "the filter of reason determining right and wrong." He complains about Althouse's court-appointed attorney and asks that his conviction be re-examined. Attached to this is a copy of the affidavit from Lawrence Althouse which has been discussed above.

The next item is a letter from an individual named Kermit Bartholomew, a retired principal from Reading, Pennsylvania. Bartholomew says that he knew Althouse from early elementary school days, and says that if Althouse was in public school today, he would be diagnosed with ADD or ADHD or SED (serious emotional disturbance), and the school system would work with them. At that time, however, they simply did not know how to diagnose and treat the problem.

Next, Althouse attaches a copy of his grievance in which he complains that he is being denied treatment for ADHD, which causes him to be at risk to himself because he does not have the biological filter to screen impulses, but instead acts off of thought. He says that he cannot focus attention, has limited insight, is easily distracted, and has a disregard for dangerous situations. For example, he cites his rushing out of the shower in October of 2004, resulting in a broken collarbone, walking around for three days with a collapsed lung, the fact that he cannot understand what is on TV, and is having a hard time

learning in the vocational course he is taking. The response to this grievance was that his report of depression is being treated with a mood stabilizer called carbamazepine [Tegretol] and citalopram, that he was scheduled to see the provider again on October 18, 2006, and that the current treatment for ADHD is with medications not available to prescribe in TDCJ. This grievance was discussed by the Magistrate Judge in her Report. The fact that Althouse was being treated with medications which he did not believe were appropriate, and that the treatment he wanted was with medications not available within the prison because of their amphetamine base, does not show a constitutional violation. Furthermore, although Althouse says that the standard ADHD treatment is with Ritalin, the affidavit from his father says that Ritalin therapy had to be discontinued because of the side effects.

Next, Althouse furnishes an information sheet from several Internet websites, including http://www.webmd.com, http://www.add-adhd.com, and http://www.adultadd.com. discussing adult ADHD. One of these sheets, labeled "ADD/ADHD, Vision, and Learning," appears to indicate that ADHD has been over-diagnosed and that some children who have been diagnosed as ADHD may in fact have a vision impairment rather than the disorder; it quotes an individual named Dr. Edward Hallowell as saying that "many people in today's hurried world may look like they had ADD when they really don't."

Althouse goes to include a self-assessment test and treatment possibilities from http://www.adultadd.com, a definition of ADHD from the DSM–IV psychiatric manual, and an article from Goodhealth Magazine about attention deficit disorder. None of this information indicates that the Magistrate Judge was in error. Althouse's objections are without merit.

The Court has conducted a careful *de novo* review of the pleadings, records and testimony in this cause, as well as the Report of the Magistrate Judge and the Plaintiff's objections thereto. Upon such *de novo* review, the Court has concluded that the Report of the Magistrate Judge is correct and that the Plaintiff's objections are without merit. It is accordingly

ORDERED that the Plaintiff's objections are overruled and the Report of the Magistrate Judge is ADOPTED as the opinion of the District Court. It is further

ORDERED that the Plaintiff's *in forma pauperis* status is REVOKED and that the above-styled civil action be and hereby is DISMISSED with prejudice as frivolous and as barred by 28 U.S.C. § 1915(g). Finally, it is

ORDERED that any and all motions which may be pending in this action are hereby DENIED.

## REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

JUDITH K. GUTHRIE, United States Magistrate Judge.

The Plaintiff Kevin Althouse, an inmate currently confined in the Texas Department of Criminal Justice, Correctional Institutions Division proceeding *pro se*, filed this civil action complaining of alleged violations of his constitutional rights. The lawsuit was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to United States Magistrate Judges. Althouse named a large number of defendants in his lawsuit.

Althouse's complaint generally revolves around the medical care which he had received. An evidentiary hearing was con-

ducted on July 31, 2007, pursuant to *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985). At this hearing, Althouse testified about his claims against each of the Defendants whom he sued. These will be set off individually.

### I. Dr. Richard Roe

Althouse said that Dr. Roe had been a physician at the Michael Unit, although he is now in Galveston. Althouse stated that in October of 2004, he fell and broke his collarbone, and was taken to Palestine Memorial Hospital. The doctor there returned him to the prison with orders that he be seen in the orthopedic clinic within two weeks. An appointment was made for Althouse in the clinic in Galveston, but Dr. Roe cancelled it, saying that he could treat Althouse at the unit. However, Althouse says, he did not see Dr. Roe until December 8, 2004; at that time, Dr. Roe said that the bones would "fuse themselves back together."

### II. Suzanne Fleming, N.P.

Althouse said that in 2006, he had work restrictions, but these were taken away and he was made to work despite the broken collarbone as well as back problems. He said that he was given a job working in the kitchen scullery, where he had to bend over and lift trays as well as engage in prolonged standing. The Court noted that when Althouse filed a grievance about this, the response was that Althouse's only work restriction was no lifting over 20 pounds, and the response said that his job was within that restriction. Althouse stated that this was because all of his other restrictions had been lifted. He said that he could not do the job because of an injury to the L–4 and L–5 discs in his lower back.

In May of 2005, Althouse said, he was medically unassigned from work. He went to another unit in November of 2005, and when he returned to the Michael Unit in December of that year, his restrictions were lifted. However, he was kept medically unassigned because he was scheduled for surgery on his collarbone in January of 2006. In late December of 2005, he suffered a collapsed lung and was taken to the hospital, and so the planned surgery could not be done. During the spring of 2006, Althouse said that he tried to get his restrictions back, but without success. His medical unassignment expired that June, and he was sent to work in the kitchen.

Althouse indicated that Fleming had "full knowledge of his condition," but then said that Dr. Roe had stated that he could work. He conceded that Fleming wanted to keep him unassigned until August, when he could be seen by the orthopedic department, but that Dr. Roe said no. He explained that Fleming did not actually remove his restrictions, but refused to reinstate them.

### III. Jeanie Allison

Althouse said that Allison was an assistant administrator at the University of Texas Medical Branch hospital in Galveston. He stated that he sent "several communications" to her regarding his restrictions, but these were denied.

### IV. Christy Atwood

Althouse said that he also sent complaints about his restrictions to Atwood, a practice manager at the Michael Unit. When asked by the Court if he thought that Atwood could override a doctor's instructions, Althouse said that his father had complained to the TDCJ ombudsman, and Atwood responded that no medical restrictions were being violated and that Althouse could work.

## V. Dr. Ken Kuykendall

Althouse said that he requested a "medical shirt," with buttons, so that he would not have to pull the jumper-type shirt over his head, which he said hurt him by making him raise his arm, but that Dr. Kuykendall refused.

## VI. Bobby Burns, R.N.

Althouse said that in January of 2004, he was working in the Officer's Dining Room when Nurse Burns came in. He told Burns that he was having some chest pain, and Burns said that it was a sprained diaphragm muscle, there was nothing that the medical department could do for it, and that Althouse should just stop working out for a few days. Althouse took this advice and the pain did go away.

In September of 2005, he said, he woke up with the same symptoms. Relying on Burns' judgment from over a year and a half earlier, Althouse said that he did not seek medical care.

After another two months went by, Althouse said that he woke up again with chest pain. He said that he filled out a sick call request just so that he could get out of his cell for a few hours and away from his cellmate. He thought that it was a sprained muscle again but in fact it was a collapsed lung, and he was rushed to the hospital for surgery.

Althouse testified that he believes that he is in danger because "Burns' judgment can't be trusted." He conceded that he was blaming Burns for advice given in January of 2004, almost two years before his lung collapsed, but explained that because of the lack of judgment resulting from attention-deficit hyperactivity disorder (ADHD), he did not realize how serious his condition was until he was in the ambulance.

## VII. Nancy Davenport

Althouse said that he was on a medication called Wellbutrin, an anti-depressant. He said that Wellbutrin was a "heat potentiator," apparently meaning that he should not be exposed to heat while taking it; he had a restriction not to work in heat. However, Althouse said, he was taken off of the Wellbutrin and put on a medication called Celexa, another anti-depressant, but this did not work. He was then put on a third medication called Nortriptyline, a tricyclic antidepressant.

Althouse complained that Davenport would not increase his doses of the medication, but acknowledged that he stopped taking them because of side effects. He said that in April of 2006, Davenport took away his restriction against working in excessive heat, and would not give it back.

## VIII. Ronnie Hill

Althouse said that he had been seen for ADHD, but that he was not treated because the treatment involved amphetamine-based medications. He filed a grievance, and the warden's response to the grievance quoted Hill (who was present at the *Spears* hearing) as saying that amphetamine-based medications could not be given out in prison.

## IX. Gary Kincade

Althouse said that he was taking a horticulture class, but he could not keep up because his ADHD caused him to have trouble learning. The instructor talked to the principal, who talked to the psych department. Kincade, a psychotherapist, said that they could not help Althouse because they did not give that type of medication (i.e. the amphetamine-based medications used to treat ADHD).

### X and XI. Cynthia Allen and Mack Hughes

Althouse said that his claims against Allen, a dental assistant, and Hughes, a dentist, had been resolved, and he wanted to dismiss these persons from his lawsuit.

### XII. Gail Karriker

Althouse said that Karriker was the chief classification officer at the Michael Unit. He said that she assigned him work which conflicted with his medical condition, and that he notified her of physical conditions which would preclude work assignments. The Court asked if the medical department did the exam and gave the restrictions, and then the classification department assigned jobs based on these restrictions, and Althouse acknowledged that this was the case; however, he said, he told Karriker about medical conditions for which he was being denied restrictions. He argued that once she was aware of these facts, she should have investigated; he pointed out that the system was not perfect and that sometimes information "fell through the cracks," and that he had documentation for what he was telling her.

### XIII. Major Jimmy Bowman

Althouse complained that Major Bowman responded to some of his grievances, but that this was improper because only a warden or assistant warden could respond. He also complained that Bowman was deliberately indifferent to him by denying his grievances. Chip Satterwhite, a TDCJ Regional Grievance Coordinator who was present at the hearing, stated that the major can serve as acting warden, and can respond to grievances in this capacity.

### XIV and XV. Sharon Different and Angela Digger

Althouse stated that Different and Digger were grievance investigators. He stated that there was several kinds of griev-

ances, and that only one regular grievance could be filed in a seven-day period, but that there are exceptions, such as if a grievance is an emergency or is filed concerning medical care. He said that Different and Digger refused some of his grievances as exceeding the one-in-seven limit, but that they should not have done so because the grievances concerned medical issues.

### XVI. Michael Berry

Althouse said that Berry was a regional recreation coordinator. He said that one form of recreation provided in TDCJ was watching television, but that because of his ADHD, he cannot focus attention on the television or retain things in his memory. He also stated that he could not understand the television unless there was closed-captioning because of the noise in the dayroom. Last June, he said, the prison switched to digital cable, but only three of the channels had closed captioning.

Althouse also said that he got into a fight with another inmate because the closed captioning was on and the other inmate asked the guard to turn it off. Althouse said that Berry came to see him, and that he, Althouse, asked that closed captioning be made mandatory and available on all channels. He contended that the denial of closed captioning denied him access to that recreational activity, which he said is "one of the few" which is open to him.

### XVII. Dr. Monte Smith

Dr. Smith is the Regional Medical Director. Althouse says that he wrote to Dr. Smith complaining about his restrictions being lifted and about injuring his back, and Dr. Smith told Dr. Thompson to review the situation. He explained that he sued Dr. Smith as a "mere formality," saying that he had heard that the Court

would dismiss lawsuits if the right people were not sued. Althouse said that he really did not want to sue Dr. Smith but thought that he had to.

### XVIII. Dr. Shelton

Similarly, Althouse said that he named Dr. Shelton as a "mere formality" and that he really did not want to sue Dr. Shelton. He agreed that both Dr. Smith and Dr. Shelton could be dismissed.

### XIX. Linda McKnight, R.N.

Althouse said that in November of 2006, he came back from surgery with orders to get two Tylenol 3's[1] four times a day. When he arrived, he was interviewed by Hill around noon. An hour later, an officer called the infirmary because Althouse's jaw was swollen, but the nursing personnel said not to bring him in. Some six hours later, around 7:00 or 7:30 p.m., an officer took Althouse to the infirmary, but McKnight "chased him away." Althouse said that he was in transient status so he had to be escorted when he came to the infirmary.

About an hour later, another call was put in to the infirmary, and he got pain medications and a dressing change. Althouse said that he also got a pass to come to the infirmary three times a day for medications, but McKnight put a stop to that; instead, she had the pill window aide take his medications to him. Althouse said that this "allowed an unauthorized person to dispense narcotics."

He also complained that he was supposed to receive antibiotics, but some of the doses were missed. He said that he did not receive his medications on November 16, and on November 17, he was sent back to the hospital in Galveston. He returned around November 20 or 21, and a couple of days later (November 22 or 23),

McKnight refused to issue his medications and told the pill window nurse to take them to his cell. On another occasion, Althouse said, another medication was substituted for the one he was supposed to take, and he complained about this, but nothing was done.

### XX. Patricia Ledbetter

On November 16, 2006, Althouse says that he exited his cell and went to the desk for an escort to the infirmary. Sgt. Ledbetter was standing at the desk and said that just because Althouse had a pass did not mean that he would be taken to the infirmary. She told Officer Gill to return Althouse to his cell, and Althouse did not get to go to the infirmary for another four hours. He said that TDCJ policy prohibited officers from interfering with inmates' medical care, and that he was supposed to get his medication at 10:30 a.m. but was not taken to the infirmary until around 4:00 p.m.

### XXI. Vickie Allen

Althouse said that Vickie Allen is a chain officer, who greets the transportation buses (known as "chain buses"), brings the inmates into the building, and helps assign them to cells. When Althouse arrived at the Michael Unit, he told her that he was in pain and that he was on a clear liquid diet. He was taken to 8 Building, where he told Allen that he needed to go to the infirmary, but nothing was done. Later, she brought him a tray of solid food, and he reminded her that he could not eat it because he had a splint wired into his jaw, but she replied "that's what they sent, that's what you get."

---

**1.** "Tylenol 3" consists of the common pain reliever known as acetaminophen, together with a narcotic called codeine. *See* http://www.healthsquare.com/newrx/tyl1466.htm.

*XXII and XXIII. Anthony Holmes and Keisha Stott*

Althouse said that his father wrote a letter to Warden Alford back in 1999 concerning Althouse's history of treatment for ADHD. However, he said, this letter has apparently disappeared from the TDCJ files. His father sent a money order for $1.00 to the law library for a copy of the letter under the Open Records Act, and Stott reviewed the files but could not find the letter. Althouse filed a grievance and Holmes responded, saying that it was not a classification issue and that the letter should be with the medical file; however, Althouse says that he has looked in his medical file and the letter is not there. He asserted at the *Spears* hearing that Holmes should have looked in the medical file before giving him this response.

Althouse said that the letter was important because the prison health authorities were saying that there was no documentation of his ADHD, but that in fact he has a mental health history going back to 1958. He said that the letter included a list of doctors whom Althouse has seen since the 1960s.

*XIV. Karen Johnson, LVN.*

Althouse says that on November 16, 2006, he went to the infirmary, but did not get the antibiotic that he was ordered. As a result, he said, an infection set in to his jaw, which was seen the next day by the dentist, who promptly put him on "something like penicillin." Althouse conceded that he received antibiotics three times a day, but said that he was supposed to get them four times a day, and this caused the infection to set in. He said that the dentist was concerned enough to give him a dose of antibiotics immediately.

*XV. Michael Unit Medical Department*

Althouse testified that he named the unit medical department as a "general catch-all." He also named the medical department in Galveston and the Wyndham School District as catch-alls.

*XVI. Guy Smith*

Althouse said that Smith was the Region 2 director, and answered several of his Step Two grievances. Smith said that there was no documentation in the medical file that Althouse suffered from ADHD, and so Althouse wrote Smith to say that the letter from his father was in his classification file. He says that he put Smith on notice of an existing problem, and nothing was done, and so Smith was deliberately indifferent.

*XVII. Vickie Barrow*

Althouse said that Barrow was in charge of access to courts. He filed a Step Two grievance about Stott, and the response from Barrow was that state law prohibited him from receiving that information because requests from inmates are exempt under the Texas Open Records Act. Althouse did not dispute that this was in fact an accurate statement of the law, but complained that his attempts to get a copy of the letter had gone "round and round in circles"—he was told that it should be in his classification file, in his medical file, and that he could not get it at all.

*XVIII. C. West*

Althouse said that West was a nurse manager at the Michael Unit. He filed a grievance against McKnight and Johnson, and the warden responded to his Step One grievance by quoting West in saying that there was no order for antibiotics when in fact there was. The response to the Step Two grievance acknowledged that the Step

One response was wrong in saying that Althouse only had an order for Tylenol 3 (and not antibiotics), but that Althouse did get three doses of an antibiotic called clindamycin that day and two doses the next day. Althouse testified that his complaint against West was that she had "given false information" to the warden, which prevented a "proper investigation" of his grievance.

### Other Testimony at the Hearing

Warden Pratt confirmed that inmates in transient status must be escorted to the infirmary. Nurse Kathy Grey said that she was not really familiar with treatment given for inmates with ADHD, and deferred to Ronnie Hill, from the psych department.

Hill stated that it is very difficult to diagnose adult ADHD and that the standard treatment for ADHD involves amphetamine-based drugs such as Ritalin or Adderol, and these are not allowed in the prison. There is a new medication, which is not amphetamine-based, but this is not available in the prison. Behavior therapy is also used, but Hill said that this was of little utility in the prison because of the lack of reinforcement.

Hill stated that even if Althouse suffered from ADHD as a child, this does not necessarily carry over into adulthood. He said that the diagnosis of adult ADHD is based on present impressions and not just childhood history, even though childhood history does play a role.

Hill noted that Althouse has been seen many times by mental health providers, with no report of ADHD. He stated that persons suffered from ADHD would have a very difficult time in recalling dates from several years back or remaining seated and calm for an hour and a half, both of which Althouse did, with no apparent difficulty, during the course of the hearing. He reiterated that a letter concerning a childhood diagnosis was "moot" with regard to a present diagnosis of adult ADHD.

Nurse Grey said that Althouse's medical records were "pretty extensive." She said that Althouse had a record of a "non-union break" in his collarbone and that he was referred for surgery in June of 2007, but apparently was not scheduled. She said that the treatment of a broken collarbone depends on the circumstances.

With regard to Althouse's restrictions, Nurse Gray said that after the injury in November of 2005, Althouse had a number of restrictions, including limited standing, no walking over 800 yards, no bending at the waist, no climbing, no reaching over his shoulder, and lower bunk only. Warden Pratt said that based on these restrictions, Althouse would normally be assigned to a medical squad; he said that a buttoned shirt would have to be approved by the medical department because the prison officers do not have buttoned shirts for inmates.

Althouse replied that in 2003, he was diagnosed as never having outgrown childhood ADHD. He said that he is now assigned to work in the kitchen, doing lifting, and Warden Pratt said that he would check on Althouse's current job assignment.

On December 28, 2005, Nurse Gray said that Althouse's medical records show that he complained of tightness in his chest, and was referred to a provider. He was seen at 3:00 p.m. and an X-ray showed that he had a collapsed lung, and was taken to the hospital in Galveston. This was diagnosed as a "spontaneous pneumothorax" (i.e. a collapsed lung without apparent cause) and he was taken to the hospital in Galveston, where he received a chest tube and surgery.

Althouse argued that when he broke his collarbone, he exited the shower "on im-

pulse, with no regard for the consequences," and slipped on the floor. He postulated that had he been diagnosed and treated for ADHD, he might not have been so impulsive, and so he would have dried off his feet before stepping out of the shower. Satterwhite noted that Althouse had been transported off of his unit of assignment some 36 times for medical treatment at a hospital or another unit.

*The Allegations of Althouse's Complaint*

In his original and supplemental complaints, Althouse says that he came into the system in 1999. He told a doctor that he had been treated for a lower back condition and had an MRI less than one year old. His treating physician wrote to the prison and sent copies of the MRI. X-rays were taken of his mouth and the dentist told him that the five remaining teeth in the lower part of his mouth should remain so that there would be something to anchor a future denture. He had no upper teeth. The dentist told him that he did not need these bottom teeth extracted. Althouse got a lower bunk pass.

On June 28, 1999, a psychiatric exam was done at the Goree Unit. This exam concluded that Althouse had limited attention span and limited insight.

In July of 1999, at the Eastham Unit, Althouse says that he sent in a sick call request about getting dentures. Dr. Fromby insisted on extracting his five lower teeth, but while doing so, he "busted up" Althouse's lower ridge bone. Another dentist, Dr. Nichols, got a grinder and ground Althouse's lower ridge bone to "nothing."

The doctor at the Eastham Unit gave Althouse a permanent bottom bunk restriction and work restrictions including limited standing and no lifting greater than 25 pounds. Althouse's father wrote a letter in August or September of 1999 telling the warden about Althouse's problems with attention deficit hyperactivity

disorder (ADHD). The warden wrote a response saying that the information had been passed on to the psychologist, Dr. Sloan, but there is no mention of this in the medical records, nor was Althouse ever contacted by Sloan.

On August 11, 1999, Althouse says, his psychiatric medications were discontinued because they had no effect on him. He was sent to the Gurney Unit in December of 1999, and between December 1999 and June 2000, he made repeated requests to the unit psychologist, Dr. Bass, for mental problems, but was denied.

In April of 2000, Althouse says that he received a full set of dentures. He has continuously complained that the lower denture does not fit correctly, and he has been treated for sore spots in his mouth. This is caused by the denture moving around, since he has no ridge bone.

In August of 2000, Althouse was sent back to the Eastham Unit. He sought mental health treatment there, but was denied. He finally filed a grievance, and was seen by a psychiatrist, Dr. Limsiaco, in February of 2003. The psychiatrist told him that he suffered from ADHD, and that the doctor who had examined him for his trial, as well as every other doctor who had ever seen him, had mis-diagnosed him. The psychiatrist ordered treatment with a medication called Wellbutrin, an anti-depressant.

On August 29, 2003, Althouse says that he was sent to the Michael Unit. On January 24, 2004, he awoke and did 50 push-ups, but then could not get any breath so he filed a sick call request. The following day, he again did 50 push-ups, in the officer's dining room where he was working, and again could not breathe. Another inmate became concerned and asked Nurse Bobby Burns about it, and the nurse said that Althouse had a sprained diaphragm muscle and he should stop working out for

a few days and it would go away, which it did. Consequently, Althouse did not go to his scheduled sick call appointment.

In August of 2004, Althouse began taking a medication called Doxazosin, for an enlarged prostate. In September of 2004, he began taking a fiber supplement.

On October 24, 2004, while Althouse was in the shower, Officer Jennings announced an in count. Althouse, acting on impulse, panicked and thought he had to get to his cell before count. He says that he "disregarded the danger" and left the shower without drying off; as a result, he fell when he stepped out on the run and broke his collarbone and rib. He was taken to the hospital in Palestine and seen by a doctor, who ordered that he be returned to the unit and seen by an orthopedic doctor in two weeks.

The next day, Jeanie Allison, associate administrator of the medical department, emailed a physician's assistant named Nolan about the need for an orthopedic appointment. Nolan responded on October 26 with the message that he had consulted with Dr. Roe, the Michael Unit doctor, and Dr. Roe told him (Nolan) to cancel the referral and that he, Dr. Roe, would treat Althouse on the unit. However, Althouse says, he did not see Dr. Roe until 43 days later.

Between October 26 and December 8, Althouse says that he submitted several sick call requests about his left shoulder blade hurting. A nurse kept responding that Althouse had an appointment scheduled with the doctor, and would not schedule him to be seen at sick call.

On December 8, 2004, Dr. Roe saw Althouse and told him that the bones would fuse themselves back together. He also discovered that Althouse had broken his rib in two places when he fell. Dr. Roe said that Althouse could work, but gave him additional restrictions of no bending at the waist and no reaching over the shoulders.

On December 27, 2004, Althouse was seen by Nurse Miller after filing a sick call request saying that the bones were not fusing themselves back together. Miller said that this had gone on too long and that it was time to send him to the orthopedic clinic in Galveston.

On January 5, 2005, Althouse again saw Dr. Roe, whom he says was "mad" that Althouse had been scheduled to see him again. However, Dr. Roe X-rayed the collarbone and told Althouse that he was going to send him to the hospital in Galveston.[2]

From December 27, 2004, until February 9, 2005, Althouse received lay-ins from work. On February 9, 2005, he was transferred to the Powledge Unit, because he had signed up for an auto body course the year before. When he got to Powledge, Warden Hodge would not let him enroll in the auto body course because of his work restrictions, but instead assigned him to work in the kitchen.

On May 9, 2005, Althouse had a video tele-med conference with a doctor in Galveston, who said that Althouse would be brought to Galveston so they could evaluate him for surgery. An X-ray taken that day showed the fracture to be worse at that time than it was on January 9, 2005.

However, on June 10, 2005, Althouse says that he refused to go on the bus to Galveston because he was taking Wellbutrin, which is a "heat potentiator" and he

---

**2.** Althouse's cover letter, accompanying his original complaint, is dated January 7, 2007. Under the two-year statute of limitations applicable to civil rights lawsuits in Texas, incidents occurring prior to January 7, 2005 are barred by limitations. *See Burrell v. Newsome,* 883 F.2d 416, 420 (5th Cir.1989).

feared that his life would be in danger from riding on a hot bus. He says that inmates have died on prison buses from the heat, and that prison policy says that inmates on psychiatric medications are not supposed to be transported on buses in the summer, but that this policy is not followed.

Althouse states that he submitted a sick call request on June 27, 2005, complaining about dizziness as a result of the doxazosin lowering his blood pressure and his working at night in the dish room in the Officers' Dining Room, so he was medically unassigned until July 6, 2005. He was called to the infirmary every night and his blood pressure checked when he sat and then when he stood up.

On July 29, 2005, Althouse was examined by Dr. Thompson at the Powledge Unit. The doctor reduced Althouse's lifting restriction to no more than 10 pounds and added a restriction for sedentary work only. The next day, he was assigned to the utility squad, which Althouse says works "maybe twice a year."

On August 16, however, Althouse says that he was sent back to the Michael Unit. He was assigned to Medical Squad No. 3 by Major Cook. Althouse's father complained to the TDCJ–CID Ombudsman's Office about his being sent back to Michael, where Dr. Roe had "botched" treating him earlier.

On September 9, 2005, Althouse was scheduled to see Dr. Kuykendall, but he sat waiting for two and a half hours, and the doctor was not even on the unit property, so Althouse says that he signed a refusal-of-treatment form. Later that month, Althouse again experienced breathing difficulties, but he did not seek medical care and it went away on its own.

On November 17, 2005, Althouse was sent to the Pack Unit, but his father complained and he was returned to the Michael Unit. On December 5, 2005, the a

physician's assistant at the Michael Unit at the Michael Unit discontinued all of his restrictions except for no lifting over 10 pounds, which he changed to 20 pounds.

One week later, on December 12, 2005, Althouse was seen at the orthopedic clinic in Galveston and he was scheduled for surgery on January 20, 2006. On December 15, Suzanne Fleming, the nurse practitioner, medically unassigned him until June 12, 2006.

On December 26, 2005, Althouse says that he woke up with chest pains and was unable to breathe properly. He filed a sick call request that evening, "only because we were locked down and I wanted to get out of my cell for a while." On December 28, 2005, he saw Nurse Sweet, who gave him a pass to return when the doctor was still there. However, Sweet did not listen to his breathing; had she done so, Althouse says, she would have discovered that there were no sounds coming from his right lung. That same day, Althouse saw the doctor, and it was learned that his right lung had collapsed. He was taken to the hospital by ambulance, where a chest tube was inserted and he was taken to Galveston by ambulance.

En route to Galveston, Althouse says, the ambulance stopped in Conroe, where the officer and ambulance attendants took a 30–minute break. During this time, Althouse was given nothing for his pain. While trying to run an IV, he says, the attendant "blew the vein" which the nurse in Palestine had prepared. The attendant ran the IV by inserting a "butterfly," but when they got to Galveston, it was discovered that the attendant had missed the vein entirely.

On December 29, 2005, a CAT scan revealed blisters on Althouse's lungs. Surgery was done on January 3, 2006, to remove part of the right lung which was not functioning. One week later, on Janu-

ary 6, 2006, an X-ray was taken of his stomach because he was suffering from incontinence. He was given a series of enemas, and was discharged to the Estelle Unit on January 9, 2006. Althouse says that he had been told to drink a lot of water, but his cell at Estelle was without water for several days; he complained of this to the guards, but nothing was done. He was sent to the Michael Unit on January 17, 2006.

Althouse says that he suffers from severe chronic hard stools and receives a fiber laxative. He had previously been treated for hemorrhoids in 1987 and 1992. When he returned to the Michael Unit, he did not get his usual supply. He experienced rectal bleeding, and Nurse Sweet gave him some ointment.

On January 11, 2006, Althouse filed a complaint saying that his life was in danger, in reference to the incident in the Officers' Dining Room two years earlier where Nurse Burns told him that he had a strained diaphragm muscle and that he should rest it for a few days, and the pain would go away. On January 30, 2006, he filed a complaint about Nurse Sweet not listening to his lungs on December 28, 2005. Althouse also submitted inmate request form about the lack of a laxative on February 1, 2006, and filed complaints about this on February 2, 6, and 9, 2006.

Althouse says that he was scheduled to go to Galveston for surgery on February 10, but refused, because the problem with his laxative, a medication called Konsyl–D, had not been resolved. However, on February 15, he saw the surgeon, who ordered four packets of laxative daily plus another laxative.

On February 17, Althouse sent another complaint about not receiving the Konsyl–D, and on February 20, they were reordered, but the prescription was changed from four packets daily to two. Althouse left the Michael Unit on February 24 to go to Galveston, and stopped at the Diagnostic Unit in Huntsville. He received enough laxative packets for three weeks there, and a doctor renewed his prescription for four packets daily until February of 2007.

When he got to Galveston on February 27, 2006, Althouse says that he was seen at the orthopedic clinic, and the doctors decided that if a blister on his lung burst during surgery, he would die. The collarbone surgery was postponed pending surgery on the lungs. The doctors also ordered that he do no lifting and not push anything like a broom. However, he says, when he returned to the Michael Unit, these restrictions were ignored.

On February 24, 2006, Althouse's father called the Michael Unit to make sure that Althouse would be on the unit the next day for a visit. They told him that Althouse was on the unit, but he was not.

On March 15, 2006, Althouse refused to go to Galveston to see the doctor about lung surgery because he was working on a legal case and was trying to be seen in the dental clinic because his lower denture was broken. On March 23, 2006, Althouse filed two complaints about his restrictions, but he says that medical personnel deny ever receiving these complaints.

On April 3 and May 15, 2006, Althouse says that impressions were taken and his lower dentures were sent out to be repaired, but when he got them back, he could not chew with them. On May 10, 2006, he submitted a request for a slow eater's pass, but this was denied. He sent a complaint to the medical grievance coordinator, but no action was taken. A request for work restrictions was also ignored.

On May 16, 2006, Althouse says, he was seen by Fleming, the nurse practitioner, because his pain medications had expired.

Fleming said that she would renew it, and that she would renew his medical unassignment until August, when he was supposed to go back to Galveston. She ordered X-rays taken of his back.

Two days later, Althouse filed a sick call request because his pain medications had not been renewed and his back was hurting. The request was returned to him with a note saying that no medications had been ordered. He filed another sick call request on May 19 saying that he had been seen by Fleming on the 16th and told to continue his previous medications. Althouse filed another sick call request on May 23, and was told that the provider did not order any pain medications and on review of the chart did not feel that it was warranted.

On May 28, 2006, Althouse filed a complaint about the medications not being renewed and about Fleming having lied to him. The response, dated May 30, was that Althouse had been seen by Fleming on May 30 and the request for restrictions had been denied.

Althouse acknowledges that he did see Fleming on May 30, and she did renew his pain medications at that time. She also told him that she had consulted with Dr. Roe about his work restrictions and he told her not to renew them because in December of 2005, while being transported to the hospital, Althouse had told the ambulance attendants that he had used the weight machine on Christmas Eve and he had reported doing push-ups in the past. Althouse filed a complaint about this, saying that the refusal to issue him work restrictions placed his life in danger, but the response was that he had been judged capable of work. Althouse says that he then sent a complaint to the unit risk manager, claiming that he was disabled, and she sent his complaint to the medical department. The reply was that Althouse's restrictions were appropriate.

Althouse next says that on June 2, 2006, while "acting on impulse," he threw some pecan bits from his cell and hit some black inmates in the head. As a result, he was told to move off the pod or he would be jumped on. Sgt. Cooper refused to help him, so he filed a grievance saying that his life was in danger. He was then moved to another cell.

On June 5, 2006, Althouse filed a complaint saying that he did not have appropriate work restrictions for the Celexa (an anti-depressant) and Tegretol (an anti-seizure medication) he was taking. On June 7, 2006, his request for restrictions was denied. The next day, he complained to the chief classification officer for the Michael Unit, Gayle Karriker, about the lack of restrictions, and then filed a grievance. This grievance was investigated by a major, not the warden (in violation of prison policy, Althouse says) and his Step One and Step Two grievances were denied.

On June 16, 2006, Althouse says that he filed a sick call request about the medications he was taking for his prostate. He said that there was a warning in the Physician's Desk reference not to operate heavy machinery or engage in activity requiring full mental alertness, and said that he had in the past experienced dizziness and that the heat in the kitchen dish room was bothering him. A response said that it had been sent to the provider, but nothing was ever done. That same day, June 16, he was assigned to work in the kitchen.

On June 19, Althouse was seen in the dental clinic for an adjustment and the dentist told him to "invest in a blender" when he got out. That same day, he filed a grievance about his work restrictions.

On June 21, Althouse was seen by Nurse Janie Hill for a series of complaints, including athlete's foot, lower back pain from working in the kitchen, and shoulder pain. Hill said that she would pass along the

complaint about work restrictions to the provider and if this did not work, Althouse should submit a request to Ms. Atwood, the practice manager. Hill also suggested that Althouse send her an inmate request form and she would have him scheduled to see Dr. Kuykendall.

That same day, Althouse's father emailed a complaint to the Office of the Ombudsman. Eloise Warzecha, administrative assistant, forwarded a copy of the complaint to the Office of Professional Standards, and Althouse's father was advised that he would get an initial response in 10 days and a final response in 30 days. However, there was no response until August 4, and then only because Althouse's father wrote complaint letters to some state representatives and to Jeanie Allison.

Meanwhile, on June 25, 2006, Althouse sent an inmate request form to Atwood, the practice manager at the Michael Unit, explaining his situation. He received a response the next day saying that Fleming had stated in his chart that there was no medical indication to unassign him. On June 29, after submitting a dental sick call request saying that he could not chew with his bottom dentures, Althouse was seen by a dentist, Dr. Eliasson, who told him that there was nothing he could do.

On July 5, 2006, Althouse was again seen by Nurse Hill, who said that she would put in for him to be seen by a different provider. However, Althouse says, he was not seen by anyone. Four days later, Althouse requested a "medical shirt" because it hurt him to raise his arm to put on a non-buttoned shirt. He was told that the request had been referred to a provider, but nothing was done.

On July 16 and 17, Althouse says, he submitted complaints and grievances about his dentures. On July 18, he submitted a sick call request about wanting a medical shirt. This request was denied. He also complained that bending at the waist was aggravating his back.

On July 20, 2006, Althouse was seen by a different dentist, Dr. Hughes, who said that there was nothing he could do about the problem with his lower denture. Althouse asked about a referral to Galveston, and Dr. Hughes said that Galveston was for medical, not dental, problems.

The next day, Althouse was seen by Nurse Karen Johnson, who found on the computer where the orthopedic clinic in Galveston had recommended no lifting and no pushing anything. She suggested that Althouse talk to someone about this when he went to Galveston for his appointment with the thoracic surgeon.

On July 28, 2006, Althouse says that he was seen by Gary Kincade, a psychologist, in response to complaints that his medication was not effective, that he could not hold anything in his memory, and that he could not handle working in the kitchen because it caused agitation and anger. Kincade said that there was nothing he could do for Althouse.

On August 2, 2006, Althouse received a letter from the Northwest District Dental Director, Dr. Collins, recommending that an oral surgeon examine his lower ridge to see if there could be implants of bone or titanium. A copy of this letter was sent to the dentist at the Michael Unit.

That same day, Althouse says that he was seen by a doctor in Galveston, who said that they would not remove the blisters on his lung, but that it was okay for the orthopedic department to operate on his collarbone. Althouse returned to the Michael Unit, where he wrote to the dental clinic about his letter he from Dr. Collins, but his request for a referral was ignored.

On August 4, 2006, a letter was sent to Althouse's father from Vickie Carlson, an investigator with the Patient Liaison Pro-

gram in the Office of Professional Standards, saying that TDCJ–CID has no control over the actions of the University of Texas Health Branch, and that there was no evidence of a problem with access to care in relation to Althouse's work restrictions. Althouse went to sick call the next day for a complaint of athlete's foot, and was medically unassigned for 60 days. On August 5, he was seen at sick call after complaining about athlete's foot, and a visiting doctor named Dr. Smith medically unassigned him until November 5 so that the problem could clear up.

Althouse submitted a sick call request on August 9, 2006, to the dental department. The next day, he refused a medical transport to Galveston because he was supposed to be seen in the dental department the next day, he feared for his health because of the heat, and he was expecting a visit from his father.

On August 11, Althouse says that he was seen in the dental department by Dr. Hughes, who issued a referral for Althouse to be seen by the oral surgeon in Galveston. That same day, he wrote a letter to Jude Forbes, a nurse practitioner who had been acting as a psychiatrist's assistant. He told Forbes that he suffered ADHD, which put him at risk to himself, that his medications were having no effect, and that he was having trouble learning in the college vocational program he was taking. Althouse says that he has since learned that Forbes is no longer on the unit, but that "someone" received his letter and read it; however, nothing was done.

On August 14, Fleming refused a request for rescheduling to the orthopedic clinic, and Althouse filed a complaint about this. On August 17, he wrote to the Galveston dental clinic saying that he was in pain from having to eat without lower dentures and asked for an expedited appointment. He then filed a grievance about having steel covers on the bus windows, which restricted air circulation. Althouse discovered on August 23 that his MRI from 1998 was missing from the computer, and filed a grievance about this as well.

On August 25, 2006, Althouse filed a grievance because he had not yet been scheduled for examination by the oral surgeon. He says that the delay is the result of overcrowding in the prison system as well as budget cuts causing a reduction in medical personnel.

On August 26, Althouse filed a complaint because the closed-captioning on the TV didn't work. He says that he is entitled to participate in recreational activities such as watching television, and not having closed captioning was discrimination under the ADA. This grievance was returned because of excessive filing of grievances, although Althouse says that both it and his complaint about the medical care were exempt from this rule; Althouse asserts that grievances complaining about medical care are exempt from the rule saying that inmates can only file one grievance a week. He then filed a grievance against the grievance investigator, Sharon Different, which was also returned unprocessed, so he filed a grievance against the investigator, Angela Dugger, who had returned this grievance. Althouse says that the failure to process his grievance is "evidence of reprisal."

On August 31, 2006, Althouse says, Atwood, the practice manager, sent Althouse's father a letter saying that Althouse was medically unassigned and that he was receiving appropriate medical care. On September 6, Althouse sent an inmate request form to the dental clinic because Warden Baker had told him that if his lower dentures could not be held by the adhesive sold in the commissary, he should complain to the dental department. Althouse says that he is in pain from having to eat without his lower dentures, and that

the kitchen does not have a blender; he requested a high-caloric diet, consisting of peanut butter and jelly sandwiches, but this was denied on September 8.

Althouse then filed a Step Two grievance regarding the lack of super-strong denture adhesive, which was denied. He received another copy of his MRI, but the administrator of medical services would not put it in his file, instead returning the MRI to him. On September 26, his free-world doctor sent another copy of the MRI to the medical administrator at the Michael Unit, as well as a letter saying that work involving bending at the waist and long periods of standing would make his condition worse.

On September 28, 2006, Althouse says, he injured his back by bending at the waist and pushing an empty wheelbarrow, and was seen by a doctor named Jack Thompson (Dr. Roe's replacement). Dr. Thompson gave Althouse most of his restrictions back and put in a referral for him to be seen at the orthopedic clinic. On October 12, Althouse filed grievances concerning the lack of closed-captioning on the TV's. Two weeks later, on October 27, he had a visit from Michael Berry, Regional Director of the Windham School District. Berry said that the prison did not have anything in its policies about providing "auxiliary aids," that there was no requirement to provide closed captioning, and that the federal funding criteria under the Americans with Disabilities Act did not apply.

On November 3, 2006, Althouse says that he was seen by a physician's assistant named Kapela, who ordered medication and physical therapy. On November 8, 2006, Althouse had surgery in Galveston, where skin was taken from his left thigh and used to build a ridge in his mouth, so that he could get a lower denture. The head surgeon told him that his hyperactivi-

ty was noticeable and that after surgery, he should be given Zantac.

After the surgery, on November 10, Althouse was discharged and taken to the Estelle Unit for recovery. He went the whole weekend without toilet paper until Monday, November 13. Also, Althouse says, the Estelle Unit has a policy that inmates can only go to the pill window three times a day, at 5:00 a.m., 8:00 a.m., and 2:00 p.m. He states that his pain medication wore off between 7:00 and 8:00 p.m., but he could not go to the pill window until the next morning, and his pain level was "10 out of 10." Althouse says that this violates prison policy because when an inmate arrives at the unit, prescribed treatment is to be uninterrupted. Althouse filed grievances, but was told that although his prescribed treatment was for administration of the medication four times a day, the pill window was only open three times a day.

On November 15, Althouse states that he returned to the Michael Unit. Within 10 minutes of his return, he was interviewed by a psychotherapist named Ronnie Hill. Althouse told Hill of his problems, and Hill said that he would pass them on to the nursing staff.

At 1:00 p.m., about an hour after he arrived back at the Michael Unit, an officer at the desk called the infirmary for Althouse and said that his jaw was swollen and he was complaining of pain, but the officer was told not to send him to the infirmary. At 4:00 p.m., Althouse was taken by Officer Allen to a cell in the transient section because of the overcrowding. The inmates there had already eaten, so Allen brought Althouse a tray from the kitchen. Althouse said that he was on a clear liquid diet, and Allen said that "this is what they sent you." When he asked to go to the infirmary, Allen said that he was in lockup and could not go to the infirma-

ry. Althouse asked to go to the desk and talk to the sergeant, but Allen denied this as well.

At 6:30 p.m., a pill window aide came by and Althouse explained his situation to her. She wrote down his name and number and said that she would inform the nurse, but she could not bring Tylenol 3 because it was a controlled narcotic.

An hour later, Althouse says that he was taken to the infirmary, where he encountered Nurse McKnight. After "chewing out" the escorting officer for bringing Althouse there without calling first, McKnight said that she knew about the situation because another nurse had said that "this is the one who's been complaining that he hasn't been getting his medications." McKnight told the officer to take Althouse back to his cell because she would have to call a provider at home to authorize the medications; she refused to authorize them herself although the order from Galveston was a standing order.

McKnight apparently did call a provider at home, because Althouse was returned to the clinic at 9:00 p.m. and the medications were dispensed. Althouse was told that the order from Galveston had been changed, but he says that this is in violation of prison policy. The next day, he filed a grievance, but it was returned unprocessed for "excessive attachments."

On November 16, 2006, Althouse was seen by Dr. Thompson, who ordered pain medications and antibiotics three times per day, a daily dressing change, and a pass so he could be brought to the clinic. The nurse issued him the pass, but forgot to include the antibiotic on the pass. This pass said that he was to come to the infirmary at 10:30 a.m. daily for medications and a dressing change.

At noon that day, Althouse was let out of his cell and went to the desk to ask for an escort to the infirmary. Sgt. Ledbetter said that "just because you have a medical pass doesn't mean that you'll be taken to the infirmary." He was ordered to return to his cell.

At 4:30 p.m., Althouse says that he finally got to go to the infirmary. Nurse Johnson only gave him the Tylenol 3, not the antibiotic. Althouse told her that the antibiotic was on the computer, and she wrote down his name and number and dismissed him, but never called him back for the antibiotic. Despite several requests, Althouse was not brought back to the infirmary for his evening medication doses.

The next day, Althouse was taken to the dental clinic after filing a sick call request. The dentist "took one look at him" and ordered that he be given an antibiotic called Amoxicillin. On November 20, the splint and wire were removed from his jaw and he was given a prescription for a pain medication called Tylenol 3.

### Althouse's Medical Records

The Court has received and reviewed copies of Althouse's medical records. These records contain extensive documentation of Althouse's collapsed lung and the surgery which he received for that, of surgery done in November of 2006 in which tissue was removed from his leg in order to build a ridge in his mouth, and of his broken collarbone, among other complaints. However, his medical records contain not a single mention of a diagnosis for ADHD. Even more significantly, the records received by the Court include over 100 sick call requests made by Althouse between November of 2005 and January of 2007, but none of these requests made any reference to ADHD. The closest that he came to mentioning such an ailment was in a sick call request dated September 19, 2006, in which he asked that a medical appointment be rescheduled for later in the morning, saying that "otherwise I won't be able to concentrate in class because of not enough sleep."

On December 1, 2005, a chain review form shows that Althouse had depressive disorder and was taking bupropion (Wellbutrin), carbamazepine (tegretol, an anti-seizure and mood stabilizing medication), cardura (doxazosin, used to treat an enlarged prostate), a pain medication called ibuprofen, and Metamucil, a dietary fiber supplement. A form dated December 15, 2005, stated that the Tegretol was being given "for impulsivity," although no ADHD diagnosis exists in the records, but only the determination of "depressive disorder." On December 28, 2005, he suffered a spontaneous pneumothorax and was taken to Palestine Memorial Hospital, and from there he went to the hospital in Galveston. The discharge notes, dated January 7, 2006, show that a chest tube had been inserted by an outside hospital. A CAT scan showed bullae (i.e. air pockets) in his lungs, and video-assisted thoracic surgery was done.

The medical records contain several references to the broken collarbone which Althouse suffered in October of 2004. A discharge record from the hospital in Galveston dated February 27, 2006, notes that Althouse has a one and a half year history of a fractured clavicle from falling in the shower; it states that "patient denies pain at this time but complains of soreness from time to time." An X-ray report dated June of 2007, after the filing of the lawsuit, says that there is a fracture through the mid-shaft region of the left clavicle and that the fracture fragments are un-united; the observation was similar to one made on May 9, 2005. On April 24, 2006, a year and a half after breaking his collarbone and about four months after suffering the collapsed lung, Althouse was seen by a nurse for a complaint of back pain and told her that he does sit-ups, push-ups, and weight lifting. She suggested that he modify this regimen to see if that helps.

Althouse had consistent difficulties with his dentures, and it was discovered that he had almost no lower ridge in his mouth (called an "atrophied mandible" in the medical records). Surgery was done in November of 2006 in which tissue was removed from his leg and a ridge built in his mouth, so that his lower dentures could be used.

On November 15, 2006, the clinic notes show that Althouse came to the clinic wanting pain medication, antibiotics, and a dressing change. The plan was listed on that form as Tylenol 3, two tablets three times a day for 10 days; clindamycin (an antibiotic), two capsules four times a day for 10 days; and a daily dressing change on the left thigh.

The next day, the clinic notes show that Althouse was brought to the clinic at 2:16 a.m., saying that he had not had antibiotics or his Tylenol 3. He was returned to his cell, and then called out on orders from the physician's assistant. When he came back to the clinic, the site on his thigh was red, with granulation (i.e. signs of healing) and drainage. It was cleansed with Betadine and normal saline, and topical antibiotic ointment was applied with a bandage. He was also given clindamycin and Tylenol 3.

That same day, about six hours later, the dressing was changed again. The tissue was granulating well without signs of infection, although a moderate amount of drainage was noted on the old dressing.

On November 21, the order for antibiotics was changed to add amoxicillin to the clindamycin. On November 24, Althouse's leg wound was described as "well healed" and there was no drainage observed. The next day, his left jaw area was described as "well healed," with minimal swelling, and no redness or drainage.

Althouse's classification records show that in November of 2005, his Health Sum-

mary for Classification form (called an HS–18 form) contained work restrictions for sedentary work only, limited standing, no lifting over 10 pounds, no bending at the waist, no reaching over the shoulder, no work in direct sunlight, and no temperature extremes. On December 5, 2005, all of these restrictions were removed except for no lifting over 10 pounds. However, he was still assigned to a medical squad.

On February 26, a restriction of "medically unassigned" was added, and the job listing was changed from the medical squad to medically unassigned. The lifting restriction was changed from 10 to 20 pounds. On June 12, 2006, the medically unassigned restriction was removed, but his job assignment continued to reflect that he was unassigned. The lifting restriction was kept at 20 pounds.

On August 7, 2006, Althouse was medically unassigned for 90 days. His job at that time was listed as a kitchen helper, and he was restricted from lifting over 20 pounds. On September 29, restrictions of limited standing, no walking over 100 yards, no lifting over 20 pounds, no bending at the waist, no climbing, and no reaching over the shoulder were added. He was still listed as medically unassigned. On November 15, the "medically unassigned" restriction was removed, but the other restrictions were retained; the spot for his job assignment was not filled in on the form.

### Althouse's Grievances

On January 11, 2006, Althouse filed a grievance against Nurse Burns, saying that Burns had put his life in danger. He states that in January of 2004, Burns gave him an inaccurate diagnosis by telling him that he had a strained diaphragm muscle, saying that there was no treatment available and that it would eventually go away, which it did. In September or October of 2005, the same thing happened again, and Althouse says that he "relied on Burns'

judgment" and did not seek medical care. In December of 2005, it happened again, and he submitted a sick call request only because the unit was on lockdown; he says in the grievance that his reason for doing so was to try to get a muscle relaxant and maybe a pillow. However, it was discovered at that time that he had a collapsed lung. Althouse says that Burns' judgment put his life in danger. The response to this grievance was that there was no record in his chart of his receiving a diagnosis in January of 2004, and he submitted a sick call in January of 2004 for breathing problems, but did not show up for sick call on January 27, 2004. He was then seen in December of 2006, when he was X-rayed and sent to the hospital in Galveston; all previous and current care was appropriate.

Althouse filed a Step Two grievance saying that the issue was that in the Michael Unit officer's dining room, Burns told him that there was nothing that could be done for his shortness of breath. Later, when it had happened twice more, Althouse relied on Burns' judgment and did not seek medical care, which could have proven fatal. He blames Burns for the fact that part of his right lung was removed. The response to this grievance was that Althouse had exceeded the time limit for filing grievances on incidents which occurred in 2004.

On June 3, Althouse filed a grievance against Lt. Patricia Walker, saying that he threw pieces of pecans out of his cell without thinking and several black inmates were hit in the dayroom. He apologized to them, but one of them refused to accept his apology and insisted on fighting. Althouse says that he was in no condition to fight and was told to request a move, but Walker and Cooper denied it. The response to this grievance was that Lt. Shead investigated his life endangerment allegation and found no evidence to support it; he then forwarded this result to

the Unit Classification Committee which likewise found no evidence to support it. On June 5, the response says, Althouse signed a waiver saying that his life was no longer in danger. Althouse did not file a Step Two appeal of this grievance.

On June 19, 2006, Althouse filed a grievance saying that he takes Tegretol and Celexa, both of which cause drowsiness, and which contain warnings not to drive cars or operate machines, but the mental health staff refuses to give him appropriate restrictions so he won't be made to operate machinery or injure himself; he says that he has been assigned to work in the kitchen operating a dishwasher. He also takes Cardura, which can cause drowsiness. The response to this grievance, from psychotherapist Ronnie Hill, says that his complaints of adverse effects from Tegretol would be passed along to the provider and that he is assigned appropriate restrictions for psychoactive medications.

Althouse then filed a Step Two grievance appeal, saying that Hill is not a medical doctor and so is not qualified to respond to the grievance. He states that Hill's response withheld information and repeats that he is not supposed to operate machinery while on these medications. The response was that the issue had been resolved because as of August 7, 2006, Althouse was medically unassigned.

On July 5, 2006, Althouse filed a grievance saying that closed captioning is not working on all of the TV stations. The response was that it was not mandated by recreation standards that closed captioning be operable on TV's in the dayroom, and that if Althouse can't hear, he should try sitting closer.

Althouse filed a Step Two grievance appeal, saying that he suffers from a mental impairment called attention deficit hyperactivity disorder, and that this impairment prevents him from focusing attention and

concentrating due to being distracted by other sounds. He says that he can only understand a program on TV through closed captioning. Althouse asserts that UTMB refuses to treat ADHD because it involves the use of amphetamine-based stimulants, which refusal he says is a "state-created impairment." Because of his disability under the Americans with Disabilities Act, Althouse says that he is entitled to be provided with closed captioning to watch TV. The response to this grievance appeal was that the Step One grievance properly addressed his complaint and that Mr. Berry, the regional recreation coordinator, reports that closed captioning is not mandated by policy; also, Althouse has no hearing restrictions.

On August 29, 2006, Althouse filed a grievance complaining that Sharon Different and Angela Dugger were harassing and retaliating against him. He says that he filed a grievance against the unit risk manager regarding closed captioning, which he says is required under the Americans with Disabilities Act because he has been diagnosed with ADHD. However, Different refused to process his grievance because it exceeded the limit of one every seven days. Althouse says that grievances raising ADA issues are "specialty grievances" and therefore exempt from the one-in-seven-days rule. He later filed another grievance, against Different, which was rejected by Dugger on the same basis. The response was that Althouse's first grievance concerned recreation and was therefore covered by the one-in-seven-days rule, and his second one concerned alleged staff misconduct, which was also covered by that rule. Althouse had 15 days from the return date in which to resubmit the grievances.

Althouse then filed a Step Two grievance appeal, saying that the issue did not involve recreation, it involved the fact that

he was not able to participate in a recreational activity due to a disability; it was thus an ADA issue, which is exempt from the screening criteria. He says that the act of denying his grievance based on screening criteria is itself discrimination against him because of his disability. He says that because he has a disability, ADHD, he is entitled to have an auxiliary aid to assist him in participating in recreational activities. The response to this grievance was that screening criteria were developed to encourage inmates to utilize the grievance procedures more responsibly, and that staff stated that grievances were being processed in accordance with policy.

On September 9, 2006, Althouse filed a grievance saying that he is being denied treatment for attention deficit hyperactivity disorder, and that after he complained that the medications being given to him for mood disorder had no effect, he was not interviewed by a doctor; he complains that there is no full-time psychiatrist on the unit. He says that the ADHD causes him to be at risk to himself because he "does not have the biological filter to screen impulses and act off of thought." He says that he cannot focus attention, has limited insight, is easily distracted, and has a disregard for dangerous situations. For example, he says that he rushed out of the shower in October of 2004 without drying off, and fell, resulting in a broken collarbone. At that time, he was taking Tegretol. He also walked around for three days in December of 2005 with a collapsed right lung, and was taken out by ambulance only after hospital personnel realized the situation. He says that he cannot understand what happens on TV without the closed captioning and has a hard time learning in the vocational course which he is taking. The response, from Ronnie Hill, says that his report of depression is being treated by carbamazepine and citalopram, and that he last saw the provider on May 10, 2006, and

had another scheduled appointment on October 18, 2006. Hill says that the current treatment for ADHD is with medications not available in TDCJ, and that he will continue to have access to care by request.

Althouse filed a Step Two grievance saying that he was not seen by the doctor on October 18 and that carbamazepine is used to treat bipolar disorder, but he does not have mood swings. Instead, he says, he does not have the biological filter to screen impulses and act off thought. He says that ADHD has been recognized by federal courts as a disability, and that he has an unvacated adjudication of being mentally ill and disabled from the Burks County Court of Common Pleas in Pennsylvania, because he cannot control his impulses.

The response to this grievance says that Althouse has no current diagnosis of ADHD and so no treatment for that disorder is indicated. There is an active diagnosis for depressive disorder, for which medication has been prescribed.

On October 5, 2006, Althouse refiled his grievance against Jack Pack, unit risk manager, whom he says is also the unit ADA coordinator. He says that he has ADHD and suffers a limited attention span, and is distracted by other sounds. Since June 20, 2006, the TV's have had closed captioning on only two TV channels. He says that the unit is obligated to provide accommodations to special needs inmates such as himself, and the failure to do so amounts to discrimination against him. The response to this grievance was that according to the information received, this issue does not fall under the ADA, and that the recreation department reports that there is no requirement for closed captioning.

Althouse filed a Step Two appeal, saying that the Step One response discriminates against him because of his disability. He says that his sensory perception is im-

paired by ADHD and that he has a right to participate in recreational activities. The response to this grievance is that there is no requirement by policy that closed captioning be made available and that upon referral of his ADA claim to the Risk Management central office, it was determined that Althouse's medical records do not reflect that he has ADHD. The response says that the risk management office suggested that he contact a unit health care provider if he is experiencing medical problems, to ascertain what accommodations are warranted.

On October 14, 2006, Althouse filed a grievance saying that on August 10, 2006, after his father had sent a money order made out to TDCJ to Officer Stott in the law library, Stott called Althouse to the law library. He made out a request to her for copies of a letter, sent in August or September of 1999, from his father to Warden Jimmy Alford at the Eastham Unit, regarding Althouse's problems with ADHD. Stotts returned the money order to Althouse's father, saying that she could not process the request; Althouse later spoke to her and she said that she could not find the letter. Althouse says that he wrote to Warden Sweetin at the Eastham Unit and asked if the letter might be in a separate file, but Sweetin said that it was not. Althouse says that he "knows for a fact" that the letter was in his unit classification file in 2001, because Warden Stacks found it and gave him a copy (which has since been lost). He complains that Stott was not thorough enough in her search. The response to this grievance was that Anthony Holmes, the law library supervisor, says that the documents which Althouse is seeking would not be kept in his inmate records file, and that Althouse can contact the medical department to see if it is in his medical file.

Althouse filed a Step Two grievance appeal, saying that the issue could have been resolved by a more thorough search at the unit level. He again says that he knows for a fact that the letter was in his file in 2001, but that the original was not put in his medical file. He says that the letter is in his file and a thorough search will prove this, and until then, he is being denied access to open records. The response to this grievance was that in accordance with Texas Gov.Code, sec. 5, art. 552.028, a governmental body is not required to accept or comply with a request for information from an individual who is imprisoned or confined in a correctional facility. This was signed by Vickie Barrow, Assistant Program Administrator for Access to Courts, Counsel, and Public Officials.

On November 13, 2006, Althouse filed a grievance saying that he was prescribed clindamycin and Tylenol 3 four times per day, but that he has only been receiving it three times a day. He says that this causes him to suffer "unbearable pain" and that prison officials are obligated not to interfere with medical care. He says that his grievance is "a life endangerment claim." The response to the grievance was that his medical records were checked on November 15 and showed that he was prescribed antibiotics every six hours for 10 days and Tylenol 3 as needed four times a day, but that the unit only has three pill times per day. The response notes that the unit health care provider has the authority of treatment, and not the specialist at the hospital in Galveston.

Althouse filed a Step Two appeal, saying that the response he received was in violation of TDCJ Administrative Directive 06.17, which says that staff at the receiving unit will review the medical records to make sure that treatment continues without interruption. In addition, he says, the denial of treatment caused him suffer pain on a scale of 10 out of 10, and caused infection and swelling to set into his jaw.

He says that the order from Galveston was a "standing order" and so the unit officials were bound to follow it. The response to this grievance was that the specialty clinic providers in Galveston make recommendations, but the facility providers have the responsibility to determine the treatment to be rendered and the recommendations which will be incorporated into the treatment plan. The response acknowledges that Althouse did not receive the medications as was ordered, but says that while it cannot be administered retroactively, the facility has been contacted on his behalf to facilitate non-recurrence of this medication concern.

On November 22, 2006, Althouse filed a grievance complaining about Officer Allen and Nurse McKnight. He says that he was returned to the Michael Unit around noon on November 15 after having surgery to his mouth, in which skin was grafted from his thigh and used to build a lower ridge in his mouth. He had a splint wired to his jaw. When he got to the unit, he told Allen that he could only have a liquid diet and was in a lot of pain. He was interviewed by Ronnie Hill and made him aware of his condition, and that Althouse's last dose of pain medication, which had been given at 5:00, some seven hours earlier, had worn off. Hill said that he would make the nurses aware of this.

At 1:00 p.m., Officer Hannah called the infirmary and said that Althouse was in a lot of pain and his jaw was badly swollen. Hannah was told not to bring him in to the clinic.

At 4:00 p.m., Allen came to Eight Building, and Althouse complained to her about needing something for a sore throat. She brought him a tray of food, but he told her that he could not eat it because he was on a liquid diet. She responded "this is what they sent." Althouse asked to go to the desk to speak to Sgt. Sweeny, but Allen would not allow him to go; when Althouse complained that he was in pain and needed his medications, she said that "you're in lock-up now, you can't go to the pill window."

A couple of hours later, at 6:20 p.m., the pill window aide came by looking for someone else, and Althouse told her about the situation. She wrote down his name and number and said that she would pass it on. At 7:30 p.m., an officer took Althouse to the infirmary, but McKnight "chewed him out" for bringing him in without calling first. She indicated that she knew about Althouse's complaint because the pill window aide had previously told her. McKnight told the officer to return Althouse to his cell, and he did not get his medications until 9:00 p.m. The response to this grievance was that he received his Tylenol 3 pain medications at 5:11 a.m. and 8:45 p.m., and that he had previously been given a keep-on-person packet of ibuprofen at the Ellis 2 Unit. His special diet was ordered on November 16.

Althouse filed a Step Two grievance appeal saying that the fact remains that he was denied access to prescribed treatment at the Michael Unit from around 12:30 p.m. until 8:45 p.m., and he suffered a great deal of pain during this time. He says that both Allen and McKnight denied him access to medical care. The response to this grievance repeats the times that Althouse received the medications and says that although Althouse waited several hours to receive the Tylenol, the medical department stated that prescribed medication from outside the facility must be clarified before distribution, and that once clarified, it will be administered.

On November 19, 2006, Althouse filed a grievance saying that at 7:30 a.m. on the morning of November 16, Dr. Thompson ordered that he be given two Tylenol 3's and a dose of clindamycin three times a day. Nurse Shugert made out a pass for

him to come to the infirmary at 10:30, but forgot to include the clindamycin on the pass. He was not filing the grievance against her, though; instead, he was complaining about Nurse Karen Johnson, an officer named Gill, Sgt. Ledbetter, and a female pill window aide.

Althouse explains that at 12:00 p.m., he asked Gill, for the third time, for an escort to the infirmary for his medication. Ledbetter responded, saying that just because he had a pass did not mean that he'd get to be taken to the infirmary, and he was sent back to his cell.

At 4:00 p.m., he and other inmates were taken to the infirmary. Nurse Johnson gave him the Tylenol, and he asked her about the clindamycin, but she said that it was not on the pass. Althouse told her that it was on the computer and she took his name and number, but never called him back. At 6:40 p.m. the pill window aide brought him some medication, but something else had been substituted for the Tylenol; Althouse says that the substituted medication "looked like Trazodone," an anti-depressant, and there was no clindamycin. The next morning, he was seen by Dr. Eliasson, the dentist, who immediately ordered that he be given penicillin, because an infection had set in as the result of missing the clindamycin. The response to this grievance was that according to Sgt. Ledbetter, Althouse had been returned to his cell because of his behavior, and he was taken to the medical department later that same day. Nurse Manager C. West reported that Althouse was only ordered Tylenol 3 and that is what he got, and that there was no evidence to substantiate misconduct by staff.

Althouse filed a Step Two appeal, saying that Ledbetter had lied because there was no behavior issue involved. He says that he went to the desk, presented his medical pass, and she denied him access to the infirmary. Althouse also says that West

lied by saying that he was only supposed to receive Tylenol 3. The response to this grievance was that his allegation of staff misconduct could not be sustained, but that unit administration was aware of his complaint and will take corrective action should any policy violations be confirmed. The response says that the Step One answer was in error by saying that Althouse was only ordered Tylenol 3, but that he received three doses of clindamycin on November 16 and two more on November 17, and he continued to receive it until November 21.

On January 9, 2007, Althouse filed a Step One grievance complaining about Guy Smith, Program Administrator III. He says that Smith answered a previous grievance, no. 5625 (which Althouse filed on September 9, 2006), by saying that there was no documentation that Althouse suffered from ADHD. Althouse says that he has written Smith twice advising him of the letter which his father had sent, that he had told Smith of a 2003 diagnosis from the Eastham Unit that he had not outgrown childhood ADHD, and that he was diagnosed in 1999 as having limited insight and a limited attention span. The response to this grievance was that the issues had been previously addressed in grievance no. 5625.

Althouse filed a Step Two appeal, saying that he had to exhaust his Step One and Step Two grievances in order to name Smith in the present lawsuit. The response was that the issue presented has been previously addressed and that Althouse has the option of providing unit health services with copies of his freeworld medical records.

*Legal Standards and Analysis*

The first issue to consider is the "three strikes" provision. The Plaintiff Kevin Althouse has had at least three lawsuits or appeals dismissed as frivolous or for fail-

ure to state a claim upon which relief may be granted by a federal district court or by the Fifth Circuit Court of Appeals. *See Althouse v. Dallas County District Court,* civil action no. 3:01cv2225, 2002 WL 255478 (N.D.Tex., February 20, 2002), (appeal dismissed as frivolous); *Althouse v. State of Texas,* civil action no. H–00–697 (S.D.Tex., May 16, 2001) (appeal dismissed); *Althouse v. Kendall,* civil action no. 3:00cv38 (N.D.Tex., March 24, 2000) (no appeal taken); *Althouse v. Kendall,* civil action no. 3:02cv1125, 2003 WL 22364201 (N.D.Tex., Oct. 15, 2003) (no appeal taken); *Althouse v. Young,* civil action no. 9:02cv289 (E.D.Tex., December 9, 2002) (dismissed as barred by three-strikes rule) (no appeal taken).

28 U.S.C. § 1915(g), added by Act of Congress on April 26, 1996 as part of the Prison Litigation Reform Act, provides that:

In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on three or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the ground that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

As set forth above, Althouse has three strikes and thus falls under the Act. The present lawsuit was signed well after the enactment of the Act.

The Fifth Circuit has addressed the validity and scope of 28 U.S.C. § 1915(g). *Carson v. Johnson,* 112 F.3d 818 (5th Cir. 1997). In *Carson,* the plaintiff argued that 28 U.S.C. § 1915(g) was unconstitutional because it blocks access to the courts and discriminates against prisoners. However, the court held that 1915(g) does not block prisoners from filing civil rights lawsuits, but merely from seeking *in forma pauperis* status to do so. The court noted that deterring frivolous and malicious lawsuits is a legitimate state interest and said that "Carson's own lengthy litigation history is the strongest possible argument for the PLRA's rationality." The same is true for Althouse's history of filing frivolous lawsuits.

On December 31, 1996, the Fifth Circuit decided another case dealing with 28 U.S.C. § 1915(g). *Adepegba v. Hammons,* 103 F.3d 383 (5th Cir.1996). In this case, the Fifth Circuit stated as follows:

Section 1915(g) is a procedural rule governing the process by which indigent individuals, including prisoners, bring civil actions or appeals in the federal courts. Before amendment, section 1915 allowed qualifying prisoners to bring an action or appeal without prepaying court fees, which are normally in excess of $100. [citation omitted].

The amended provisions of section 1915(b) allow qualifying individuals to pay the filing fee in installments over time. 28 U.S.C. § 1915(b), as amended. Although Section 1915(g) attaches consequence to past actions, we find that these consequences are matters of procedure. Section 1915(g) does not affect a prisoner's substantive rights, and it does not block his or her access to court. A prisoner may still pursue any claim after three qualifying dismissals, but he or she must do so without the aid of the i.f.p. procedure.

*Adepegba,* 103 F.3d at 386–87.

The revocation of the privilege bestowed by Section 1915 is not a new phenomenon. The Fifth Circuit stated that before the Prison Litigation Reform Act, courts routinely revoked a prisoner's ability to proceed *in forma pauperis* after numerous dismissals. *See, e.g., Green v. Carlson,* 649 F.2d 285 (5th Cir.1981). By enacting Sec-

tion 1915(g), Congress determined that three prior qualifying dismissals (i.e. dismissals of lawsuits or appeals as frivolous) constituted *per se* abuse of the *in forma pauperis* privilege. Thus, the Fifth Circuit said that the "three strikes" provision of 28 U.S.C. § 1915(g) merely codified existing practice in the courts designed to prevent prisoners from abusing the *in forma pauperis* privilege. *Adepegba,* 103 F.3d at 387.

The court noted that prisoners who are not allowed to proceed *in forma pauperis* may pursue their substantive claims, just like anyone else, by paying the filing fee. This requirement is neither novel nor penal and does not increase the prisoner's liability, but puts those who abuse a privilege on the same footing as everyone else. The Fifth Circuit expressly found that Section 1915(g) did not impair prisoners' rights, increase their liability, or impose a new duty, and concluded by holding that Section 1915(g) was applicable to Adepegba's appeal, despite the fact that this appeal was filed in December of 1995, four months prior to the enactment of the PLRA.

In this case, Althouse has had at least three lawsuits previously dismissed as frivolous, and so comes under the statute. He did not pay the filing fee of $350.00, and so the relevant question is whether he has shown that he faced an imminent threat of serious physical injury as of the time of the filing of the present lawsuit. *See Banos v. O'Guin,* 144 F.3d 883, 885 (5th Cir.1998).

Althouse's medical records make clear that he has received and is receiving a considerable quantum of medical care. In his objections to a prior Report, Althouse argued that the denial of treatment for ADHD causes him to be a risk and danger to himself which could result in serious or fatal injuries. He also says that the failure to perform surgery to remove the "bleps" from his left lung is a serious risk to his life because if one of the "bleps" should burst, it could cause the lung to collapse.[3] Furthermore, he says, the procrastination in performing surgery on his collarbone places his life in danger because if he falls or is assaulted, a broken bone could puncture his left lung. He says that he is also suffering a great deal of pain in his lower back.

A review of the pleadings, testimony, and records in this case fails to show that Althouse was under imminent danger of serious physical injury at the time of the filing of the lawsuit. As noted above, there is no diagnosis of ADHD in his medical records, and the only evidence that Althouse suffers from this ailment is his own assertion that he does. The courts have held that when an inmate alleges a serious medical need either for treatment or to avoid certain conditions, the inmate's bare assertion of a serious medical condition is insufficient without medical evidence verifying that the condition exists. *Aswegan v. Henry,* 49 F.3d 461, 465 (8th Cir.1995); *accord, Kayser v. Caspari,* 16 F.3d 280, 281 (8th Cir.1994) (prisoner's self-diagnosis alone will not support a medical conclusion). The medical records contain no sick call requests in which Althouse complains of ADHD; while he does complain of an inability to concentrate in one such request, he ascribes this to lack of sleep, not ADHD.

Furthermore, the Court had occasion to observe Althouse in the course of a two-hour evidentiary hearing. During this hearing, Althouse remained seated quietly,

**3.** A "blep," also called a "bleb" or a bulla, can be an air pocket, a fluid-filled sac, or simply a cyst or blister in or on the lung.

calmly discussing his case. He remained consistently focused and talked about his claims in a clear, logical, and coherent manner. Althouse had no apparent difficulties in following the course of the hearing despite the fact that it was conducted by video teleconference without closed captioning on the TV. While these facts in themselves are not dispositive, they could help to explain why Althouse has not been diagnosed with ADHD, in that he appears able to mask the symptoms over an extended period of time. Althouse has not shown that his claim of ADHD placed him in imminent danger of serious bodily injury at the time of the filing of his lawsuit.

Althouse also contends that the failure to remove "bleps" or bullae from his lungs placed him in imminent danger, because he says that if one of these should cause his lungs to collapse, his life could be in danger. While large bullae can be surgically removed, small ones cannot, and persons with many good air sacs do not necessarily benefit from the surgery. *See, e.g.,* http://www.thoracic.org/sections/copd/for-patients/what-other-treatments-are-available.html. The fact that Althouse has not had surgery to remove the blebs on his lungs does not show that he is in imminent danger of serious physical injury. In addition, Althouse has been seen and examined for this condition by the medical personnel in Galveston, and his disagreement with their assessment of his condition does not show that he is in imminent danger of serious bodily injury.

 The courts have stated that in order to meet the imminent danger requirement of Section 1915(g), the threat must be "real and proximate." *Ciarpaglini v. Saini,* 352 F.3d 328, 330 (7th Cir.2003). Allegations of past harm do not suffice;

the harm must be imminent or occurring at the time that the complaint or notice of appeal is filed, and the exception refers to "a genuine emergency" where "time is pressing." *Heimermann v. Litscher,* 337 F.3d 781, 782 (7th Cir.2003). In passing the statute, Congress intended a safety valve to prevent impending harms, not those which had already occurred. *Abdul–Akbar v. McKelvie,* 239 F.3d 307, 315 (3rd Cir.2001). In that case, the Third Circuit rejected a claim that allegations of having been sprayed with pepper spray, combined with a claim that prison officials engaged in "continuing harassment, plots to hurt or kill him, and other forms of retaliation," sufficiently alleged imminent danger. Althouse has not shown that the failure to perform surgery on the blebs on his lungs constitutes such an imminent danger and his claim on this point is without merit.[4]

Althouse additionally claims imminent danger from the fact that surgery has not been performed on his broken collarbone. This claim is not sufficient to show that he is in imminent danger, as defined above; according to the American Academy of Orthopaedic Surgeons, most broken collarbones heal well without surgery. *See* http://orthoinfo.aaos.org/topic.cfm?topic=A00072. While surgery may be desirable in Althouse's case, the fact that this has not been done does not show a "genuine emergency where time is pressing" or an imminent harm, occurring at the time of the filing of the complaint. Because Althouse did not pay the filing fee and has failed to show that he was in imminent danger of serious physical injury at the time of the filing of the complaint, his lawsuit is barred by the "three strikes" provision of 28 U.S.C. § 1915(g).

---

4. It is not clear that Althouse himself believes his lungs to be in imminent danger; an entry in the medical records dated April 24, 2006, after he had suffered the collapsed lung, shows that he told the nurse that he did sit-ups, push-ups, and weight lifting, all of which are activities which can place strain on the lungs.

 Even were his complaint not so barred, however, Althouse has failed to show that it contains any merit. His primary complaint is that he is being denied adequate medical care, most notably in the area of treatment for ADHD. The Fifth Circuit has held that deliberate indifference to a convicted inmate's serious medical needs could state a civil rights violation, but a showing of nothing more than negligence does not. *Norton v. Dimazana,* 122 F.3d 286, 291 (5th Cir.1997); *Jackson v. Cain,* 864 F.2d 1235, 1246 (5th Cir. 1989). However, simple disagreement with the medical treatment received or a complaint that the treatment received has been unsuccessful is insufficient to set forth a constitutional violation. *Johnson v. Treen,* 759 F.2d 1236, 1238 (5th Cir.1985); *Norton,* 122 F.3d at 293.

Furthermore, malpractice alone is not grounds for a constitutional claim. *Varnado v. Lynaugh,* 920 F.2d 320, 321 (5th Cir.1991). Negligent or mistaken medical treatment or judgment does not implicate the Eighth Amendment and does not provide the basis for a civil rights action. *Graves v. Hampton,* 1 F.3d 315, 319–20 (5th Cir.1993). The Fifth Circuit has held that the fact that medical care given is not the best that money can buy, and the fact that a dose of medication may occasionally be forgotten, does not amount to deliberate indifference to serious medical needs. *Mayweather v. Foti,* 958 F.2d 91 (5th Cir. 1992).

More pertinently, the Fifth Circuit has held that an inmate who had been examined by medical personnel on numerous occasions failed to set forth a valid showing of deliberate indifference to serious medical needs. *Spears v. McCotter,* 766 F.2d 179, 181 (5th Cir.1985). It should be noted in this regard that medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs. *Banuelos v. McFarland,* 41 F.3d 232, 235 (5th Cir.1995).

In *Domino v. TDCJ–ID,* 239 F.3d 752 (5th Cir.2001), an inmate who was a psychiatric patient expressed suicidal ideations and the psychiatrist returned him to his cell after a five-minute examination; the inmate committed suicide two and a half hours later. The Fifth Circuit, in reversing a denial of summary judgment by the district court, stated as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference. *Johnson v. Treen,* 759 F.2d 1236, 1238 (5th Cir.1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* Furthermore, the decision whether to provide additional medical treatment "is a classic example of a matter for medical judgment." *Estelle v. Gamble,* 429 U.S. 97, 107, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). And, "the failure to alleviate a significant risk that [the official] should have perceived, but did not," is insufficient to show deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 838, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

*Domino,* 239 F.3d at 756; *see also Stewart v. Murphy,* 174 F.3d 530, 534 (5th Cir. 1999).

In this case, the medical records contain no diagnosis for ADHD, and Althouse has offered nothing beyond his own assertion that the condition even exists. As stated above, an the inmate's bare assertion of a serious medical condition, or his own self-diagnosis, is insufficient without medical evidence verifying that the condition ex-

ists. *Aswegan v. Henry,* 49 F.3d at 465; *Kayser v. Caspari,* 16 F.3d at 281. Althouse refers to a letter which he says should be in his files and to a diagnosis supposedly made in 2003, but neither of these appear to be available to prison authorities at the present time. Even if prison officials should have perceived the condition but did not, this is not enough to show that they were deliberately indifferent to a serious medical need.

In addition, Althouse has not shown harm from the fact that the prison officials did not perceive his condition, because it is not clear what action they could have taken. As Hill pointed out, and as responses to Althouse's grievances explained to him, the standard treatments for ADHD, such as Ritalin or Adderol, are not available in prison because they are amphetamine-based. Instead, he was given a medication called Tegretol, one of the purposes of which is to treat persons with impaired judgment, which is the harm that Althouse cites from ADHD.[5] Furthermore, Althouse's assertions of harm from the failure to diagnose ADHD are speculative at best. The fact that Althouse did not receive the medication he would have preferred, or that the medication he received was not as effective as he would have liked, is not proof of deliberate indifference to a serious medical need. *Graves,* 1 F.3d at 320; *Mayweather,* 958 F.2d at 91. Althouse's claim on this point is without merit.

Althouse also complains that a nurse named Davenport refused to increase his doses of medication, but then indicated that he stopped taking the medications because of side effects. Had Davenport increased his dosage as he wished, the side

effects would presumably have become worse; in any event, the fact that Davenport did not comply with Althouse's request and give him the dosage of medication which he thought appropriate does not show that Davenport acted with deliberate indifference to Althouse's serious medical needs.

In a related claim, Althouse complains that he is being "denied access to recreation" because closed captioning is not available on all channels. There is no constitutional right to watch television. *Scheanette v. Dretke,* 199 Fed.Appx. 336 (5th Cir.2006) (not selected for publication in the Federal Reporter); *Sanders v. Ryan,* 484 F.Supp.2d 1028 (D.Ariz.2007) (citing *Scheanette*). In *Ryan,* the inmate claimed that the failure to issue him headphones amounted to an ADA violation, inasmuch as he was hearing-impaired, but the district court rejected this claim. In *Aswegan v. Bruhl,* 113 F.3d 109 (8th Cir.), *cert. denied sub nom. Aswegan v. Emmett,* 522 U.S. 956, 118 S.Ct. 383, 139 L.Ed.2d 299 (1997), the Eighth Circuit held that cable television within a prison is not a "public service, program, or activity" within the contemplation of the ADA, and thus fell outside of the scope of that statute.

To establish a claim under the ADA, the plaintiff must show (1) that he is a qualified individual under the Act; (2) that he is being excluded from participation in or being denied benefits of services, programs, or activities for which the defendants are responsible, or that he is otherwise being discriminated against by the defendants; and (3) that this exclusion, denial of benefits, or discrimination is by

---

**5.** Impaired judgment can be a byproduct of several mental disorders, not merely ADHD; Althouse was diagnosed with "depressive disorder" and given Tegretol for that condition, and the medical records show that this medication was given for "impulsivity." To the

extent that Althouse claims harm from having "acted on impulse," the records show that the prison officials were not indifferent to and in fact attempted to treat this aspect of Althouse's behavior.

reason of the disability. *Lightbourn v. County of El Paso, Texas,* 118 F.3d 421, 428 (5th Cir.1997); *see Davidson v. Texas Department of Criminal Justice,* 91 Fed. Appx. 963 (5th Cir.2004) (not selected for publication in the Federal Reporter) (rejecting inmate's ADA claim because the inmate failed to show that he was adversely treated solely because of his handicap).

In this case, Althouse has offered no evidence, beyond his own assertion, that he is a qualified individual under the Act; as noted above, the prison medical records do not reflect a diagnosis of ADHD. Even assuming that he is disabled, and further assuming that television is a "service, program or activity for which the defendants are responsible," a rather dubious assumption, Althouse has failed to show that he has been excluded from this service, program or activity because of his disability. This Court has not found a single case in any jurisdiction, state or federal, in which the provision of closed-captioning television for persons suffering from ADHD was mandated under the ADA. Like Davidson, Althouse has not shown that he suffered any adverse treatment because of his disability, and so his claim on this point is without merit.[6]

Althouse complains that Keisha Scott and Anthony Holmes were unable to find a letter which he says that his father wrote, back in 1999. He says that the letter exists because he was given a copy of it in 2001, but that this copy has now been lost; he indicates that a copy may also have been sent to his father in 2001, but that his father is now elderly and that copy also cannot be located.

The fact that Scott and Holmes could not find the letter does not show that a constitutional violation occurred. Althouse does not allege, much less show, that they intentionally withheld the letter from him; instead, he complains about "getting the run-around." Althouse explains that he was told that the letter should be in his medical file, which it was not, that it was not in his classification file or in another file on the Eastham Unit, and that when he filed a Step Two grievance, he was told that he could not get the letter at all because prison officials were not required to respond to inmate requests under the Texas Open Records Act. None of the various explanations for where the letter might be, nor the information that officials are not required to respond to inmate requests, shows that a constitutional violation took place. The fact that the letter apparently was lost may show negligence or carelessness on the part of prison officials, but this is not enough to set out a constitutional violation. *Daniels v. Williams,* 474 U.S. 327, 331–33, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). His claim on this point is without merit.

In the same vein, Althouse sues several prison grievance officials, including Different, Dugger, Smith, Bowman, and Barrow, because of allegedly improper responses to his grievances. The Fifth Circuit has held that inmates do not have a constitutionally protected liberty interest in having grievances resolved to their satisfaction, and so there is no violation of due process when prison officials fail to do so. *Geiger v. Jowers,* 404 F.3d 371, 373–74 (5th Cir. 2005) see also *Edmond v. Martin, et al.,* slip op. no. 95–60666, 1996 WL 625331 (5th Cir., Oct. 2, 1996) (unpublished) (claim by prisoner that defendant "failed to investigate and denied his grievance" raises no constitutional issue). Althouse's claims on this point are without merit.

Next, Althouse complains of the treatment which he received for his broken

---

**6.** As noted above, the evidentiary hearing was conducted by video, without closed captioning, and Althouse had no apparent difficulty in following the course of the hearing.

collarbone. As stated above, surgery is often not performed at all on broken collarbones, because most of them heal without surgery. Althouse was scheduled for surgery in late 2006, but it had to be postponed because of his collapsed lung. He has not shown that the medical care which he received for the broken collarbone amounted to deliberate indifference to his serious medical needs; although he asserted that he has difficulty in lifting his arms as a result of the injury, he nonetheless advised the nursing staff on at least one occasion that he was able to do sit-ups, push-ups, and lift weights, each of which places far more strain on the collarbone than merely lifting one's arm to put on a shirt. This claim is without merit.

Althouse also complains about the treatment he received for his collapsed lung. He first attempts to blame Nurse Bobby Burns for telling him in January of 2004, almost two years earlier, that chest pains which Althouse was experiencing at that time were the result of a strained diaphragm muscle. He says that Burns told him to stop exercising for a few days and pain would go away, which they did. Althouse offers the novel argument that because of the apparently accurate advice which he had received in January of 2004, he did not immediately seek medical attention when he again suffered chest pains in December of 2005, with the result that he almost died from a collapsed lung. This is plainly insufficient to show that Burns was deliberately indifferent to Althouse's medical needs, and his claim on this point is without merit.

With regard to the collapsed lung itself, it is clear from the records that Althouse received a significant amount of medical care. He was taken to Palestine Memorial Hospital, where a chest tube was inserted, and then taken to John Sealy Hospital in Galveston, where he says that surgery was performed. This is a level of care far about that of "deliberate indifference."

Althouse also says that he saw a nurse named Sweet, who did not listen to his breathing, and that had she done so, she would have discovered the collapsed lung a few hours before it was actually discovered. He did not name Nurse Sweet as a defendant in the case, but even if he had done so, his claim against her is simply one of negligence or a lack of due care rather than deliberate indifference, and so is without merit. *Stewart,* 174 F.3d at 534. Nor has Althouse shown deliberate indifference in any other way with regard to his lung; the fact that he has not had surgery as quickly as he would have liked does not rise to the level of a constitutional violation, particularly in light of the fact that Althouse has been able to remain active and exercising since suffering the collapsed lung. This claim is without merit.

Althouse complains about the situation with his dentures, but the medical records show that he was repeatedly seen by dental personnel, that a problem was diagnosed with his lower ridge, and surgery was performed in an attempt to correct the problem. Such corrective efforts may not have been as successful as Althouse would have liked, but he has not shown that prison officials were deliberately indifferent to his medical needs in this area of care. His claim on this point is without merit. *Norton,* 122 F.3d at 291.

Althouse complains at length about his work restrictions, saying that they were improperly lifted and that he was assigned to perform work beyond his capacity to do. The Fifth Circuit has stated that requiring an inmate to work beyond his physical capacity may raise a valid civil rights issue, but the Plaintiff must show that the work has been assigned with knowledge of the condition and that it will be worsened

thereby, or continued with the same knowledge. As a result, the Fifth Circuit said, only if the officials know that the work assigned will significantly aggravate a serious medical condition will there be an Eighth Amendment violation. *Jackson v. Cain,* 864 F.2d 1235, 1246 (5th Cir.1989). In other words, if prison officials assign an inmate to a work detail and they know that such an assignment could exacerbate a serious physical ailment, then such a decision could constitute deliberate indifference. *Mendoza v. Lynaugh,* 989 F.2d 191, 194 (5th Cir.1993).

■ In this case, Althouse has failed to show that prison officials knew that the work which was assigned to him was beyond his capacity to do. He argued at the *Spears* hearing that he told officials that his restrictions were wrong, and that this "placed them on notice" that an investigation was needed. He conceded that the work restrictions came from the medical department and that he was expecting non-medical personnel to question the decisions of the medical staff, but insisted that his complaints to the prison officials were sufficient to put them on notice that his restrictions were wrong despite this. This contention is without merit; prison officials have no constitutional duty to believe inmates' claims as to their medical condition as opposed to the findings of medical professionals. *See, e.g., Taylor v. McElvaney,* slip op. no. 1:01cv94 (N.D.Tex., Aug. 12, 2002) (unpublished) (available on WESTLAW at 2002 WL 32138256) (no duty to believe inmate's allegations over officer's statement and medical record), *citing Al–Rai'id v. Ingle,* 69 F.3d 28, 33 (5th Cir.1995); *Ali v. Hoke,* slip op. no. 9:06cv230 (E.D.Tex., June 5, 2007) (unpublished) (available on WESTLAW at 2007 WL 1655915) (no duty to believe inmate's version of the facts and resolve his grievances in the manner he desired).

Nor has Althouse shown that the medical personnel were deliberately indifferent with regard to his work classification. The fact that he disagreed with their assessment of his physical condition is not proof of deliberate indifference. *Johnson v. Treen,* 759 F.2d at 1238. For most of the time period covered by the lawsuit, Althouse was either medically unassigned or assigned to a medical squad, which he concedes did virtually no work. He was assigned for a period of time to work in the kitchen, which he said made his back hurt, but this fact by itself does not show that the medical personnel were deliberately indifferent to his serious medical needs. *See Wilson v. Lynaugh,* 878 F.2d 846, 849 (5th Cir.), *cert. denied* 493 U.S. 969, 110 S.Ct. 417, 107 L.Ed.2d 382 (1989) (Eighth Amendment does not afford protection against "discomfort or inconvenience"). He offers nothing to show that the work assignment which he received significantly aggravated a serious medical condition. Althouse's claim on this point is without merit.

In a similar vein, Althouse complains that TDCJ policy was not followed regarding taking vans to Galveston during the summer, and that on one trip to Galveston, the prison officials on the bus took a 30–minute break without providing him with any pain medication. The Fifth Circuit has held that a violation of prison rules or policy alone is not sufficient to rise to the standards of a constitutional claim. *Myers v. Klevenhagen,* 97 F.3d 91, 94 (5th Cir. 1996); *Hernandez v. Estelle,* 788 F.2d 1154, 1158 (5th Cir.1986). Althouse has not shown that this alleged violation of policy, or the failure to provide him with pain medication over a 30–minute break period, amounted to deliberate indifference to his serious medical needs so as to rise to the level of a constitutional violation. His claims on these points are without merit.

On May 16, 2006, Althouse says that he was seen by Suzanne Fleming, the nurse practitioner, because his pain medications had expired. Fleming said that she would renew his prescriptions, and that she would renew his medical unassignment until August, when he was supposed to go back to Galveston. She ordered X-rays taken of his back. On May 18, Althouse filed a sick call request complaining that his pain medications had not been renewed and his back was hurting. The request was returned to him with a note saying that no medications had been ordered. He filed another sick call request on May 19 saying that he had been seen by Fleming on the 16th and told to continue his previous medications. Althouse filed another sick call request on May 23, and was told that the provider did not order any pain medications and on review of the chart did not feel that it was warranted.

On May 28, 2006, Althouse then filed a complaint about the medications not being renewed and about Fleming having lied to him. The response, dated May 30, was that Althouse had been seen by Fleming on May 30 and the request for restrictions had been denied. Althouse concedes that his pain medications were renewed on May 30.

Althouse essentially disagrees with the nurse practitioner's assessment that he did not need pain medication. He concedes that Fleming told him that the pain medications were discontinued, at Dr. Roe's order, because of his ability to exercise, including lifting weights, and that just one month earlier, in April of 2006, he told medical personnel that he did sit-ups and push-ups as well as lifting weights. Under these circumstances, Althouse has not shown that Fleming or Dr. Roe were deliberately indifferent in concluding that he did not need pain medication, nor can he plausibly claim that he was unable to work,

although he could perform exercises on his own. This claim is without merit.

Similarly, Althouse complains that he could not lift his arms over his head and so he should have been given a medical shirt, with buttons. His disagreement with Dr. Kuykendall's assessment that he did not need such a shirt does not rise to the level of a constitutional violation. This claim is without merit.

Finally, Althouse complains of the events following his return to the Michael Unit on November 15, 2006. He says that about an hour after he arrived back at the Michael Unit, an officer at the desk called the infirmary and said that Althouse's jaw was swollen and he was complaining of pain, but the officer was told not to send him to the infirmary. At 4:00 p.m., Althouse was taken by Officer Allen to a cell in the transient section because of the overcrowding. The inmates there had already eaten, so Allen brought Althouse a tray of solid food from the kitchen; when Althouse said that he was on a clear liquid diet, Allen replied that "this is what they sent you." Allen also would not let him go to the infirmary.

At 6:30 p.m., a pill window aide came by and Althouse explained his situation to her. She wrote down his name and number and said that she would inform the nurse, and an hour later, he was taken to the infirmary, where he encountered Nurse McKnight. After "chewing out" the escorting officer for bringing Althouse there without calling first, McKnight said that she knew about the situation because another nurse had said that "this is the one who's been complaining that he hasn't been getting his medications." McKnight told the officer to take Althouse back to his cell because she would have to call a provider at home to authorize the medications; she refused to authorize them herself although the order from Galveston

was a standing order. The medications were dispensed to him at 9:00 p.m.

The next day, Althouse was seen by Dr. Thompson, who ordered pain medications and antibiotics three times per day, a daily dressing change, and a pass so he could be brought to the clinic. The nurse, identified in his grievance as Nurse Shugert, issued him the pass, but forgot to include the antibiotic on the pass. This pass said that he was to come to the infirmary at 10:30 a.m. daily for noon medications and a dressing change.

However, Althouse was not let out of his cell until noon, at which time Sgt. Ledbetter told him that "just because you have a medical pass doesn't mean that you'll be taken to the infirmary" and ordered him to return to his cell.

At 4:30 p.m., Althouse says that he finally got to go to the infirmary. Nurse Johnson only gave him the Tylenol 3, not the antibiotic. Althouse told her that the antibiotic was on the computer, and she wrote down his name and number and dismissed him, but never called him back for the antibiotic. Despite several requests, Althouse was not brought back to the infirmary for his evening medication doses.

The next day, Althouse was taken to the dental clinic after filing a sick call request. The dentist "took one look at him" and ordered that he be given an antibiotic called Amoxicillin. On November 20, the splint and wire were removed from his jaw and he was given a prescription for a pain medication called Tylenol 3.

Althouse complains that he was denied access to medical care, but his pleadings and testimony, as well as the medical records, show that in each instance, he received medical care, albeit after a delay of a few hours. The Fifth Circuit has held that delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference which results in substantial harm. *Mendoza*, 989 F.2d at 195.

In *Ward v. Dallas County Jail*, slip op. no. 3:01cv1395 (N.D.Tex., Feb. 26, 2004) (unpublished) (available on WESTLAW at 2004 WL 370224), the plaintiff suffered a three-and-a-half hour delay in receiving medical care for an assault resulting in a broken jaw. The district court held that the plaintiff was required to show that there was an excessive risk that a few hours' delay in treating him would result in further harm, that the defendant was subjectively aware of such a risk, and that the defendant consciously disregarded this risk. The district court observed that the plaintiff received treatment at a hospital within approximately three and a half hours after his injury, and produced no evidence that the injury was exacerbated during this period.

In the present case, Althouse has offered nothing to show that there was an excessive risk that a delay in treatment would result in further harm, that the defendants involved were subjectively aware of such a risk, or that they consciously disregarded this risk. Unlike in *Ward*, where the plaintiff had been the victim of an assault resulting in a traumatic injury, Althouse was returning from the hospital and needed medical care only for follow-up purposes. He has not presented anything to show that his injuries were exacerbated by the delays in treatment which he suffered; while it is true that he was delayed by several hours in the receipt of pain medication, this by itself does not raise the incident to constitutional proportions. In *Haddix v. Kerss*, 203 Fed. Appx. 551 (5th Cir.2006) (not selected for publication in the Federal Reporter), the plaintiff complained of occasional denial of pain medication or delay in transferring him to a lower bunk. The Fifth Circuit stated as follows:

The result of the defendants' actions was unrelieved, pre-existing back and shoulder pain, not a worsening of his condition or other serious harm. *See Mayweather v. Foti,* 958 F.2d 91, 91 (5th Cir.1992) (stating continuous back pain, while unpleasant, does not demonstrate a constitutional violation). Haddix has not shown that the defendants were deliberately indifferent to his needs for other medical treatment. Although he may not have received the amount of treatment he felt necessary, such a claim constitutes a disagreement with the medical staff, which is not actionable in a § 1983 proceeding. *See Varnado v. Lynaugh,* 920 F.2d 320, 321 (5th Cir. 1991).

Like Mayweather, Althouse has not shown that the denial of pain medication caused a worsening of his condition or other serious harm. Instead, he complains of unrelieved pain, for a period of less than a day. This does not set out a constitutional violation. *See also Hooper v. Johnson,* civil action no. 2:00cv236, 2003 WL 21355896 (N.D.Tex., June 9, 2003) (unpublished) (inmate plaintiff denied medical care for one day after a bus accident; held not to constitute deliberate indifference because of lack of knowledge of a severe risk to health). The fact that Althouse was delayed by a matter of hours in receiving pain medication, and the fact that he missed one meal at this time because he was brought a tray of solid food which he could not eat, do not set out constitutional violations.

Althouse also says that he was denied a few doses of an antibiotic which had been ordered for him. He says that he was supposed to get the antibiotic four times a day, but the medical records show that some of these doses were missed. As noted above, the fact that a few doses of medication may be missed is not proof of deliberate indifference. *Mayweather,* 958 F.2d at 91. Althouse claims that as a result of missing a few doses of antibiotics, he developed an infection in his jaw; even if the infection was the direct result of the few missed doses, which seems rather unlikely, he concedes that when he saw the dentist, he was given penicillin to clear up this infection.[7]

The medical records and grievance responses make clear that there was a mix-up with Althouse's medication. As he says, the nurse apparently did not note that he was supposed to receive an antibiotic along with his pain medication, and so a Step One grievance response erroneously says that he was not prescribed an antibiotic. The Step Two grievance response corrects this error and observes that Althouse received five doses of antibiotics in a two-day period. Even if there was some negligence or carelessness, Althouse has not shown deliberate indifference to his serious medical needs. His claims are without merit.

### RECOMMENDATION

It is accordingly recommended that the plaintiff's *in forma pauperis* status be revoked. It is further recommended that the above-styled civil action be dismissed with prejudice as frivolous and as brought in contravention of the "three-strikes" rule. 28 U.S.C. §§ 1915A, 1915(g).

A party's failure to file objections to the findings, conclusions, and recommendations contained in this Report within ten days after service with a copy thereof shall bar that party from *de novo* review by the district judge of those findings, conclusions, and recommendations and, except upon grounds of plain error, from appel-

---

7. Missing a dose of antibiotics is hardly unusual, and patients are told simply to take the next dose as normal. *See* http://www.nlm. nih.gov/medlineplus/druginfo/medmaster/a 682399.html# if-i-forget (referring specifically to clindamycin).

late review of the unobjected-to proposed factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

So **ORDERED** and **SIGNED** this 29 day of **January, 2008.**